859 A.2d 1173

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. CHARLES E. REDDISH, JR., DEFENDANT–
APPELLANT.

Argued October 8, 2003—Decided November 10, 2004.

554

556

558

*James K. Smith, Jr.*, and *Brian L. Zavin*, Assistant Deputy Public Defenders, argued the cause for appellant (*Yvonne Smith Segars*, Public Defender, attorney).

*Steven A. Yomtov*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Attorney General of New Jersey, attorney).

*Charles E. Reddish, Jr.*, submitted a supplemental brief pro se.

Justice ZAZZALI delivered the opinion of the Court.

A jury found defendant Charles E. Reddish, Jr., guilty of knowing or purposeful murder by his own conduct. At the sentencing phase of the trial, a separate jury determined that aggravating factors outweighed mitigating factors beyond a reasonable doubt, and the court sentenced defendant to death. Defendant appeals both his conviction and his sentence.

## I.

On Friday, February 22, 1991, Dede Rosenthal reported to work at the Elwyn Institute in Vineland, New Jersey, where she trained

staff to work with autistic children. At 4:47 p.m., on the way home from work, she withdrew eighty dollars from an automatic teller machine (ATM). Later that evening, she spoke on the phone with a friend, Sherri Klemow. She also spoke with John Bristol, whom she had been dating. Bristol worked at Somerset Towers in Cherry Hill, the apartment complex where Rosenthal lived.

Early the next morning, a loud noise emanating from Rosenthal's apartment awoke Lucy Faricelli, Rosenthal's elderly downstairs neighbor. Although she would later express some confusion about the exact date she heard the noise, Faricelli told police in March 1991 that she heard a "thump" on the floor above her late Friday night. She also heard Rosenthal's patio door open and close, and heard a cat crying on the balcony. Prior to that night, she had never heard any noises from Rosenthal's apartment.

Rosenthal did not report to work on Monday, February 25, or Tuesday, February 26, nor did she call in sick or contact anyone at the Elwyn Institute. Rosenthal had no prior unexplained absences from work during her previous six months of employment. Two of her coworkers became concerned and, on Wednesday, February 27, reported Rosenthal missing to the Cherry Hill Police Department.

Police officers went to Rosenthal's apartment to investigate the report. They noticed that newspapers had accumulated outside the unlocked front door. Upon entering her unit, the officers observed that the apartment was neat and showed no sign of a struggle or forced entry. Rosenthal's bed was made. Her closets were orderly and full of clothes, and her luggage, passport, and personal appointment book were still in the apartment. Rosenthal's keys were on the kitchen counter and her cat was outside on the balcony. The temperature inside the apartment was normal and the officers noted no unusual odors or smells. Her car, containing her briefcase and topcoat, was still in the parking lot. A subsequent search of the entire apartment complex and its

grounds by the officers, assisted by a dog trained to detect the scent of human decomposition, failed to locate Rosenthal.

As part of the investigation, police interviewed employees of the apartment complex, including Bristol, who told them he had last spoken with Rosenthal at approximately 10:00 p.m. on Friday night. They also spoke with defendant, who worked as a porter in the building. Defendant answered their questions but denied any knowledge of Rosenthal's whereabouts.

Further efforts to locate Rosenthal proved unsuccessful. The police contacted individuals named in Rosenthal's personal appointment book, but nobody had heard from or seen Rosenthal since February 22, 1991. The police confirmed that no one named Dede Rosenthal had purchased a plane, train, or bus ticket. Discussions with employees at Rosenthal's bank disclosed that one banking transaction occurred on March 1, 1991, but the police later discounted that as a pre-arranged, automated transaction.

On June 12, 1992, police in Burlington County arrested defendant on another, unrelated charge. Hearing of the arrest, the officers investigating Rosenthal's disappearance again questioned defendant. He continued to deny any knowledge of, or involvement in, her disappearance.

Rosenthal's family made additional attempts to locate her. Private investigators hired by the family were unable to discover anything regarding her disappearance. The family's continuing efforts, however, did result in the feature of Rosenthal's disappearance on an episode of the television show "Unsolved Mysteries." That episode aired nationally six times between April 1993 and October 1995. In response to the broadcasts, the program received more than 150 calls from around the country, including Florida, Oklahoma, and California. The Cherry Hill Police Department sent form letters to the police departments in each city from which the calls originated, requesting assistance in following up sightings reported by viewers in those areas. Those local police departments then reported back to the Cherry Hill department. None of those leads bore fruit.

On October 6, 1995, more than four years after Dede Rosenthal disappeared, investigating officers of the Cherry Hill Police Department, still with no leads and no suspects, learned from a television news broadcast that defendant had been arrested for the murder of his girlfriend, Rebecca Wertz, and other charges, and was being held in Burlington County Jail. On October 11, detectives from the Cherry Hill Police Department interviewed defendant at the Burlington County Prosecutor's Office. After waiving his *Miranda*[1] rights, defendant provided a lengthy tape-recorded statement admitting that he had killed Rosenthal and disposed of her body in Salem County. Later that evening, he placed a telephone call to John Knarr, a reporter for the *Burlington County Times*. In an interview tape-recorded by Knarr, defendant again admitted to killing Rosenthal.

In March 1997, the Camden County Grand Jury indicted defendant for knowing or purposeful murder, felony murder, robbery, burglary, and hindering apprehension in connection with Rosenthal's death. Defendant successfully moved for the dismissal of the robbery, burglary, and hindering-apprehension counts of the indictment as barred by the applicable statute of limitations.

Subsequently, defendant faced trial in Burlington County for the murder of Wertz. After a jury found defendant guilty in that proceeding, the Camden County Grand Jury reindicted defendant, charging him with knowing or purposeful murder by his own conduct and felony murder for the death of Rosenthal. The State also served a notice of aggravating factors, pursuant to *Rule* 3:13–4(a), alleging that defendant had been convicted of another murder (*i.e.*, Wertz's killing), *N.J.S.A.* 2C:11–3c(4)(a); that the murder of Rosenthal was committed in the course of a felony, *N.J.S.A.* 2C:11–3c(4)(g); and that defendant killed Rosenthal to escape detection, *N.J.S.A.* 2C:11–3c(4)(f).

Defense counsel, consistent with defendant's request but against their own advice, submitted a timely motion on behalf of defendant

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

to dismiss counsel and to substitute defendant as pro se counsel. Defendant withdrew an earlier request that he serve as co-counsel to his designated attorneys or, in the alternative, that the court appoint his designated attorneys as standby counsel. The trial court held a hearing to address defendant's motion. We discuss the testimony and colloquy at the hearing more fully later in this opinion.[2] Suffice it to note here that the trial court questioned defendant at length. Defendant stated that he understood the charges and the possible sentences he faced, but he concluded that he would be able to defend himself. The trial court voiced concern about defendant's understanding of his right to remain silent and, more specifically, defendant's ability to avoid incriminating himself during the cross-examination of witnesses. The court then denied defendant's motion to appear pro se made pursuant to *Faretta v. California*, 422 *U.S.* 806, 95 *S.Ct.* 2525, 45 *L.Ed.*2d 562 (1975), reasoning that defendant did not knowingly and voluntarily waive the assistance of counsel because he did not understand the danger that statements made before the jury during the course of representing himself might result in an inadvertent waiver of his Fifth Amendment right to remain silent.

Defendant's guilt-phase trial began on September 25, 2001. Defendant's statements to the detectives and to Knarr formed the bulk of the State's case. The State also presented evidence to corroborate the trustworthiness of defendant's statements. From that evidence, a jury reasonably could have found the following facts.

Defendant lived with Rebecca Wertz in the same building as Rosenthal. On the evening of Rosenthal's murder, defendant used a substantial amount of cocaine. He returned to his apartment between 1:00 a.m. and 2:00 a.m. and, shortly thereafter, took the stairs to the roof of the apartment building. With a key he possessed by virtue of his job as a porter, he gained access to the

---

[2] The details of the colloquy and the trial court's decision are provided *infra* at Part III.A.

roof and then swung down onto Rosenthal's balcony. Once on the balcony, he opened the unlocked sliding door and entered her apartment.

Having seen Rosenthal in the building and in the lobby and having spoken about her with Bristol, defendant entered Rosenthal's apartment seeking a sexual encounter. He walked around her apartment and observed that she was alone. While he was looking on her bureau for valuables, she awakened. Rosenthal saw defendant in her bedroom, pulled the blankets over her head, and let out a slight scream.

Defendant dove towards her and covered her mouth with his hand. She fought back, biting his hand and scratching his face. Defendant then beat her about the head, causing Rosenthal to lose consciousness, fall out of bed, and slump to the floor. Fearing that she would later identify him to the police, defendant then suffocated Rosenthal while she was still unconscious by covering her mouth and nose with his hand. He placed her back on the bed, went to the kitchen, and found her pocketbook. He removed eighty dollars in cash. Leaving her car keys on the bar, he unlocked the front door in the event that he had to re-enter the apartment. He then exited the dwelling by climbing back onto the roof from the balcony.

One or two days later, defendant noticed newspapers accumulating in the hallway outside of Rosenthal's door. Fearing that someone would discover her body, he returned to Rosenthal's apartment later that night with a shopping cart and a painter's blanket. Rosenthal's corpse was leaking bodily fluids onto the bed. He wrapped her body in the fitted sheet from the bed and put her in the shopping cart. Next, he removed the top sheet and made the bed by pulling up the bedspread.

Defendant pushed the shopping cart containing the body out of Rosenthal's apartment and exited the grounds of the complex. He left her body, still in the shopping cart, at a nearby baseball field and returned to the apartment building to retrieve Wertz's car. He then drove back to the field, placed Rosenthal's body in the

back, and proceeded south on Route 130 towards Pedricktown. After entering an area he described as a landfill and proceeding an additional twenty-five yards or so, defendant removed Rosenthal's body from the car and tried to bury her, but the ground was too hard. He then took her fifteen to thirty feet further into an area covered with six-foot-tall weeds. Defendant left the victim's body hidden only by the vegetation. He then drove back to the apartment building, retrieved the shopping cart from the baseball field, and returned the cart to the building's boiler room. He put the painter's blanket, the shovel, the sheets from Rosenthal's bed, and her purse into a dumpster near the apartment complex. He then cleaned out Wertz's car to eliminate the smell of bodily fluids. Finally, according to defendant, he returned to his apartment "like ... nothing ever happened," except to tell his girlfriend, Wertz, that he had killed Rosenthal.

After confessing to the murder four and a half years later, defendant assisted the police in looking for her remains. He led them to a dredging disposal area near Pedricktown, where sediment from the Delaware River had been repeatedly dumped during the intervening years, creating a rough, overgrown terrain that changed with each subsequent dumping. After several hours of searching the area, the police failed to find Rosenthal's remains. Her body was never recovered.

At trial, defendant focused on the lack of a body to argue that Rosenthal had not died in February 1991. In support of his theory that Rosenthal had disappeared on her own and had not been killed, defendant presented three witnesses who stated that they saw Rosenthal at a bar in Jackson Township, Ocean County, in March 1991. The witnesses testified that they contacted police in response to a local news broadcast regarding Rosenthal's disappearance. They stated that a young woman resembling Rosenthal had come into the bar. She appeared disoriented, had no money, and was looking for a ride to Florida. The woman told the patrons that her name was "Lori" and, in response to their queries, denied being Dede Rosenthal.

Defendant also sought to refute his confessions to both the police and the newspaper reporter by arguing that at the time he made the statements, he was deluded into thinking that he had killed Rosenthal. In support of this contention, defendant pointed to inconsistencies between his statements and other facts surrounding Rosenthal's disappearance. For instance, the police did not notice any odor upon first entering Rosenthal's apartment. Defendant, however, presented Dr. John Adams, a pathologist, who testified that a human body begins decomposition immediately upon death and produces a noticeable smell within twenty-four hours. Dr. Adams explained that a body decomposing on a bed for two or three days would produce a strong smell in the room that would remain for a substantial period after the body was removed.

In further support of his claim that he was delusional when he confessed, defendant pointed to part of the statement he gave to Knarr. In that statement, defendant had attempted to explain "why [he] would ... commit a murder." He engaged in a rambling description of a motor vehicle accident that happened when he was sixteen years old. Apparently, he had collided with another vehicle and quickly left the scene of the accident. Although he described the collision as minor and stated that he never saw the driver of the other vehicle, he imagined that she had dark hair and envisioned her slumped over in her car. Days later, he heard somebody on a citizens' band radio mention that the police were looking for somebody who had killed a woman. Defendant explained to Knarr that—without knowing anything else about either the car accident or the killing mentioned on the radio—he immediately assumed that he had killed the other driver and that the police were looking for him. For the next six years, he "thought that [he had] committed a very bad crime" and worried that the police were going to arrest him. As he related to Knarr, that episode led defendant to think of himself as a "killer." At trial, defendant argued that, just as in his story about the car accident, he only imagined his involvement in Rosenthal's death.

The jury nonetheless found the State's evidence convincing and, on October 11, 2001, found defendant guilty of purposeful or knowing murder and felony murder. It also found that defendant committed the murder by his own conduct, thereby rendering him eligible for the death sentence. The penalty phase of the trial began on June 19, 2002, before a separate jury.

As noted, the State alleged prior-murder as an aggravating factor. *N.J.S.A.* 2C:11–3c(4)(a). To establish that defendant previously had been convicted of the knowing or purposeful murder of Wertz, the State offered testimony of the Burlington County assistant prosecutor who had prosecuted defendant in that proceeding. The State also presented the testimony of the medical examiner who had performed the autopsy on Wertz. He indicated that Wertz died from multiple head injuries consistent with repeated hatchet blows. Additionally, the State alleged aggravating factors in the form of murder to escape detection and felony murder, *N.J.S.A.* 2C:11–3c(4)(f) and (g), and re-introduced portions of the guilt-phase evidence pertinent to those issues.

In response, defendant presented evidence in support of nine mitigating circumstances under the "catch-all" category, *N.J.S.A.* 2C:11–3c(5)(h). A member of the Camden County Sheriff's Department and members of defendant's family testified on his behalf.

On June 26, 2002, the jury returned its verdict. It found all three aggravating factors to be present and found five mitigating factors, namely, that defendant had provided good-faith assistance to the police by attempting to locate Rosenthal's remains (four jurors); that defendant had been exposed to violence, hatred, drunkenness, or substance abuse (eleven jurors); that defendant suffered from delusions, hallucinations, or mental illness since early adolescence (three jurors); that defendant confessed freely to the Rosenthal murder without any threats having been made or promises or inducements given to him (twelve jurors); and the existence of an unspecified factor relating to defendant's character or the circumstances of the offense (one juror). The jury unani-

mously rejected defendant's claims that he suffered an impairment due to mental illness, defect, or intoxication; had formed close affectionate bonds with his sister and mother; had failed to receive appropriate treatment for mental illness; and had expressed genuine remorse for his actions.

The jury unanimously concluded that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Accordingly, that same day, the trial court sentenced defendant to death in a judgment of capital conviction. The court also imposed a sentence of life in prison with a thirty-year parole disqualifier on the felony-murder charge, to run concurrent to the capital-murder conviction but consecutive to defendant's sentence on the previous conviction for the murder of Wertz.

Defendant filed this appeal as of right, *Rule* 2:2–1(a), in which he raises a number of issues, including violation of his constitutional right to self-representation, error in admitting other-crimes evidence, faulty jury instructions, lack of sufficient corroboration of his confession, prosecutorial misconduct, and an illegal sentence. For the reasons that follow, we reverse the convictions and remand the matter for a new trial.

## II.

### *Pro se Representation in Capital Penalty Phase*

■ In Thomas More's *Utopia,* there are laws but there are no lawyers. More explains: "[The Utopians] think it better for each man to plead his own cause, and tell the judge the same story as he'd otherwise tell his lawyer." Thomas More, *Utopia* 106 (Penguin ed.1965). Defendant makes much the same point in this appeal. As attractive as that argument may be, that notion is unworkable in our non-utopian world.

We deal initially with the denial of defendant's motion to proceed pro se. This appeal represents the first time that a defendant sentenced to death in New Jersey has raised such a claim on direct appeal since the United States Supreme Court

recognized the right of self-representation in *Faretta v. California, supra,* 422 *U.S.* 806, 95 *S.Ct.* 2525, 45 *L.Ed.*2d 562. Defendant argues that the trial court violated his Sixth and Fourteenth Amendment rights when it denied his motion to proceed pro se. According to defendant, that error requires reversal of his conviction. His claim presents this Court with a "direct clash between the right of self-representation and the state's obligation to provide a fair trial to criminal defendants, especially capital defendants." *United States v. Kaczynski,* 239 *F.*3d 1108, 1119 (9th Cir.2001) (Reinhardt, J., dissenting), *cert. denied,* 535 *U.S.* 933, 122 *S.Ct.* 1309, 152 *L.Ed.*2d 219 (2002).

In the following discussion, we first consider the *Faretta* doctrine and its criticisms. Next, in accordance with the *Faretta* framework, we inquire into the scope of defendant's right to self-representation in the penalty phase of a capital prosecution. *See Martinez v. Court of Appeal of California, Fourth Appellate District,* 528 *U.S.* 152, 120 *S.Ct.* 684, 145 *L.Ed.*2d 597 (2000) (setting forth *Faretta's* format for analyzing right to proceed pro se). Our analysis leads us to conclude that defendant has a right to proceed pro se during both guilt and penalty phases of a capital prosecution. Finally, *infra* at Parts III and IV, we examine the limitations on that right, namely, the requirement of knowing and voluntary waiver of counsel and the appointment of standby counsel.

## A.

We commence our analysis of the scope of a defendant's right to proceed pro se during capital trials with the case law that set forth the boundaries of the right of self-representation under the Sixth Amendment. Relying on the language and structure of the Sixth Amendment, as well as the historical practices in England and the colonies, the United States Supreme Court concluded in *Faretta, supra,* that the Sixth Amendment prohibits states from "hal[ing] a person into its criminal courts and there forc[ing] a lawyer upon him, even when he insists that he wants to conduct his own

defense." 422 *U.S.* at 807, 95 *S.Ct.* at 2527, 45 *L.Ed.*2d at 566. The Court acknowledged that it was "not an easy question," *ibid.,* and that such a rule "seems to cut against the grain of ... decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel," *id.* at 832, 95 *S.Ct.* at 2540, 45 *L.Ed.*2d at 580 (citations omitted). But, the Court concluded, "the notion of compulsory counsel was utterly foreign" to the Framers of the Sixth Amendment: "[I]t is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want." *Id.* at 833, 95 *S.Ct.* at 2540, 45 *L.Ed.*2d at 580. Instead, the Sixth Amendment right to "assistance of counsel" was intended as "an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally." *Id.* at 820, 95 *S.Ct.* at 2533, 45 *L.Ed.*2d at 573. The personal autonomy of the defendant—"that respect for the individual which is the lifeblood of the law"—outweighs any competing interests that would compel representation. *Id.* at 834, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581 (quoting *Illinois v. Allen,* 397 *U.S.* 337, 350–51, 90 *S.Ct.* 1057, 1064, 25 *L.Ed.*2d 353, 363 (1970) (Brennan, J., concurring)).

The Court was aware of the implications of its holding. It acknowledged the likely detriment to a defendant who chooses to proceed pro se. *Id.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581. Specifically, the Court noted that a defendant who represents himself "relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Ibid.* Accordingly, the Court stressed that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " *Id.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 582 (quoting *Adams v. United States ex rel. McCann,* 317 *U.S.* 269, 279, 63 *S.Ct.* 236, 242, 87 *L.Ed.* 268, 275 (1942)).

The *Faretta* doctrine has generated criticism. Indeed, Chief Justice Burger vigorously dissented in *Faretta, e.g., id.* at 838, 95 *S.Ct.* at 2542, 45 *L.Ed.*2d at 582 (Burger, C.J., dissenting) ("[T]here is nothing desirable and useful in permitting every accused person, even the most uneducated and inexperienced, to insist upon conducting his own defense to criminal charges."), as did Justice Blackmun, *e.g., id.* at 849, 95 *S.Ct.* at 2548, 45 *L.Ed.*2d at 590 (Blackmun, J., dissenting) (noting that nothing in Constitution "requires the States to subordinate the solemn business of conducting a criminal prosecution to the whimsical—albeit voluntary—caprice of every accused who wishes to use his trial as a vehicle for personal or political self-gratification"). In *Martinez, supra,* Justice Stevens, writing for the Court, indicated his reluctance to extend *Faretta* to other steps in a criminal prosecution. 528 *U.S.* at 161–62, 120 *S.Ct.* at 691, 145 *L.Ed.*2d at 607 (observing that right to self-representation was "not absolute" and concluding that "[e]ven at the trial level, . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"). The concurring opinions in *Martinez* reinforce the conclusion that the *Martinez* majority had, at a minimum, reservations about *Faretta. Id.* at 164, 120 *S.Ct.* at 692, 145 *L.Ed.*2d at 608 (Kennedy, J., concurring) (implying that majority holding "casts doubt upon the rationale of *Faretta* "); *id.* at 165, 120 *S.Ct.* at 693, 145 *L.Ed.*2d at 609 (Scalia, J., concurring) (observing majority's "apparent skepticism" concerning *Faretta* ); *id.* at 164–65, 120 *S.Ct.* at 692–93, 145 *L.Ed.*2d at 608 (Breyer, J., concurring) (acknowledging that "judges closer to the firing line have sometimes expressed dismay about the practical consequences of [*Faretta* ]," but noting lack of empirical basis for questioning *Faretta's* constitutional foundation). Legal commentators also have questioned the doctrine, echoing many of the concerns raised in the *Faretta* dissents. *See, e.g.,* John F. Decker, *The Sixth Amendment Right to Shoot Oneself in the Foot: An Assessment of the Guarantee of Self–Representation Twenty Years After Faretta,* 6 *Seton Hall Const. L.J.* 483 (1996); Martin Sabelli & Stacey Leyton, *Train Wrecks*

*and Freeway Crashes: An Argument for Fairness and Against Self Representation in the Criminal Justice System,* 91 *J.Crim. L. & Criminology* 161 (2000).

Despite these criticisms, until the Supreme Court sees fit to overturn *Faretta,* it, of course, remains law. Nor do we imply that there is any indication the Court might soon revisit that holding. In respect to this appeal, however, we note that *Faretta* does not distinguish between a defendant's right of self-representation in the penalty and guilt phases of a capital trial. But, because the legal commentary cited above suggests that *Faretta* can and should be read narrowly, and because the Supreme Court has never specifically addressed a defendant's right to represent himself during the capital penalty phase, further analysis is warranted.

### B.

We thus take this opportunity to present in detail the historical and decisional background of the right in issue. Our discussion will demonstrate the closeness of the question presented, provide guidance for future courts and litigants, and afford context for our requirement of standby counsel, discussed *infra* at Part IV.

The United States Supreme Court stated in *Faretta, supra,* that the right of self-representation does not "arise[ ] mechanically from a defendant's power to waive the right to the assistance of counsel. On the contrary, the right must be independently found in the structure and history of the constitutional text." 422 *U.S.* at 820 n. 15, 95 *S.Ct.* at 2533 n. 15, 45 *L.Ed.*2d at 572 n. 15 (citation omitted). Therefore, our inquiry as to whether the right to self-representation exists at the penalty phase, and if so, the scope of that right, must begin with the Sixth Amendment.

*Faretta* and *Martinez* provide the appropriate framework for the analysis. As the Supreme Court discussed in *Martinez, supra:*

> First, [*Faretta* ] examined historical evidence identifying a right of self-representation that had been protected by federal and state law since the beginning of our Nation. Second, it interpreted the structure of the Sixth Amendment, in the light

of its English and colonial background. Third, it concluded that even though it is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts, a knowing and intelligent waiver must be honored out of that respect for the individual which is the lifeblood of the law.

[528 *U.S.* at 156, 120 *S.Ct.* at 688, 145 *L.Ed.*2d at 603 (citations and internal quotation marks omitted).]

We now consider those three guideposts.

## 1.

We turn to the first of *Faretta's* three "inter-related arguments," the historical evidence. *Id.* at 156, 120 *S.Ct.* at 688, 145 *L.Ed.*2d at 603. After setting forth the relevant English and colonial history, the *Faretta* Court concluded that the Framers understood the Sixth Amendment to imply a right of self-representation for criminal defendants. *Faretta, supra,* 422 *U.S.* at 832, 95 *S.Ct.* at 2539–40, 45 *L.Ed.*2d 562. The Court stated: "In the long history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding." *Id.* at 821, 95 *S.Ct.* at 2534, 45 *L.Ed.*2d at 574. And that tribunal, known as the "Star Chamber," "characteristically departed from common-law traditions," and "has for centuries symbolized disregard of basic individual rights." *Ibid.* According to the Court, not only did American colonists agree that criminal defendants have a right to self-representation, their belief in that right "was, if anything, more fervent than in England." *Id.* at 826, 95 *S.Ct.* at 2537, 45 *L.Ed.*2d at 576–77. "We have found no instance where a colonial court required a defendant in a criminal case to accept as his representative an unwanted lawyer." *Id.* at 828, 95 *S.Ct.* at 2538, 45 *L.Ed.*2d at 577.

Yet, we hesitate to conclude that the historical record speaks unequivocally in favor of finding the *Faretta* right for defendants during the penalty phase of a capital trial. Indeed, the modern-day capital trial, bifurcated into guilt and penalty phases, did not exist when the Bill of Rights was adopted.

The Supreme Court laid the constitutional groundwork for the bifurcated capital system in *Furman v. Georgia,* 408 *U.S.* 238, 92

*S.Ct.* 2726, 33 *L.Ed.*2d 346 (1972), by invalidating state statutes under which juries exercised unrestrained discretion to impose capital punishment. Justice Stewart, in a concurrence, stated: "[T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.* at 310, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 390 (Stewart, J., concurring). The problem with unguided jury discretion was that it provided "no meaningful basis for distinguishing the few cases in which [the death penalty was] imposed from the many cases in which it [was] not." *Id.* at 313, 92 *S.Ct.* at 2764, 33 *L.Ed.*2d at 392 (White, J., concurring).

Four years after *Furman,* the Supreme Court invalidated mandatory death penalty schemes because they were not consistent with "the evolving standards of decency that mark the progress of a maturing society" and that give meaning to the Eighth Amendment. *Woodson v. North Carolina,* 428 *U.S.* 280, 301, 96 *S.Ct.* 2978, 2989, 49 *L.Ed.*2d 944, 959 (1976) (plurality opinion) (quoting *Trop v. Dulles,* 356 *U.S.* 86, 101, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958)). On the same day the Court decided *Woodson,* it endorsed Georgia's bifurcated capital trial scheme, in which a "defendant is accorded substantial latitude as to the types of evidence that he may introduce" at the penalty stage. *Gregg v. Georgia,* 428 *U.S.* 153, 164, 96 *S.Ct.* 2909, 2921, 49 *L.Ed.*2d 859, 869 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). The Court recognized that "accurate sentencing information" about "the character and record" of an individual offender, which "is an indispensable prerequisite to a reasoned determination" on punishment, often may be irrelevant or extremely prejudicial to a decision on guilt. *Id.* at 190, 206, 96 *S.Ct.* at 2934, 2940, 49 *L.Ed.*2d at 884, 893. For that reason, the Court stated that the concerns of *Furman* "are best met by a system that provides for a bifurcated proceeding." *Id.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 887.

In sum, even though the Framers of the Sixth Amendment did not contemplate imposing counsel on an unwilling defendant, they

also did not foresee the evolution of Eighth Amendment jurisprudence and the separate penalty phase. We, therefore, do not find that the historical record speaks unconditionally in favor of applying *Faretta* to the capital penalty phase. In light of those conflicting concerns, we proceed to the remaining *Faretta/Martinez* factors.

### 2.

The second of *Faretta's* three "inter-related arguments" derives from the structure of the Sixth Amendment itself. It provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." *U.S. Const.* amend. VI.

*Faretta, supra,* rooted its holding in the fact that the Amendment "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant," and not the "master." 422 *U.S.* at 820, 95 *S.Ct.* at 2533–34, 45 *L.Ed.*2d at 573. The Court also emphasized that the Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Id.* at 819, 95 *S.Ct.* at 2533, 45 *L.Ed.*2d at 572. Thus, the Court concluded that "[a]lthough not stated in the Amendment in so many words," the text implies a right to self-representation. *Ibid.* In stating that conclusion, the Court remarked on the Framers' justification: "The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails." *Id.* at 819–20, 95 *S.Ct.* at 2533, 45 *L.Ed.*2d at 572–73.

As noted, the historical record does not decisively determine whether *Faretta* applies to the penalty phase. However, the text of the Sixth Amendment, as discussed in *Faretta*, suggests that defendants have such a right. We now consider the final strain of *Faretta.*

### 3.

*Faretta,* ultimately, is about respecting a defendant's capacity to make choices for himself, whether to his benefit or to his detri-

ment. It is a defendant's harmful decisions that, in turn, implicate Eighth Amendment concerns about fair and consistent application of the death penalty. The State has both a profound interest in, and a constitutional duty to ensure, the reliability and integrity of a penalty trial resulting in a death sentence. Hence, more than in any other class of cases, where capital convictions are concerned, it is not the defendant's interests alone that are at stake; society has a vested interest in a fair and consistent application of its most extreme penalty.

*Faretta* viewed the right of self-representation as a natural embodiment of a defendant's personal autonomy, the wellspring of the "respect for the individual which is the lifeblood of the law." *Id.* at 834, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581 (quoting *Illinois v. Allen, supra,* 397 *U.S.* at 350–51, 90 *S.Ct.* at 1064, 25 *L.Ed.*2d at 363 (Brennan, J., concurring)). As the Court noted in *McKaskle v. Wiggins:* "The right to appear pro se exists to affirm the dignity and autonomy of the accused...." 465 *U.S.* 168, 176–77, 104 *S.Ct.* 944, 950, 79 *L.Ed.*2d 122, 132 (1984). At the same time, however, the autonomy interests of a defendant diminish following conviction. According to the Supreme Court in *Martinez, supra:* "The status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict." 528 *U.S.* at 162, 120 *S.Ct.* at 691, 145 *L.Ed.*2d at 607.

Even though the Supreme Court observed in *Faretta, supra,* that "[t]he right to defend is personal" and the "defendant, and not his lawyer or the State, will bear the personal consequences of a conviction," 422 *U.S.* at 834, 95 *S.Ct.* at 2540–41, 45 *L.Ed.*2d at 581, the Court has also recognized that the penalty phase of a capital trial necessitates a "heightened reliability" that is "demanded by the Eighth Amendment," *Sumner v. Shuman,* 483 *U.S.* 66, 72, 107 *S.Ct.* 2716, 2720, 97 *L.Ed.*2d 56, 63 (1987); *cf. People v. Chadd,* 28 *Cal.*3d 739, 170 *Cal.Rptr.* 798, 621 *P.*2d 837, 844 (stating that capital defendant's appeal "is not entirely 'his

appeal' " because of state's "indisputable interest" in safeguarding against arbitrariness), *cert. denied,* 452 *U.S.* 931, 101 *S.Ct.* 3066, 69 *L.Ed.*2d 431 (1981). Thus, as this brief discussion demonstrates, ascertaining the scope of a capital defendant's right to appear pro se during sentencing requires that we reconcile the defendant's constitutionally-protected autonomy interest with the State's constitutionally-mandated need for reliability.

4.

Although we have discovered no clear answer to the question whether a defendant has a right to appear pro se during capital sentencing, we accept the principle that defendants have that right. The Sixth Amendment provides a defendant the right to be left to his own devices, if he so chooses. *See Faretta, supra,* 422 *U.S.* at 820, 95 *S.Ct.* at 2533, 45 *L.Ed.*2d at 573 ("The language and spirit of the Sixth Amendment contemplate that counsel" shall not "be an organ of the State interposed between an unwilling defendant and his right to defend himself personally."). However, our application of the *Faretta/Martinez* factors, coupled with the concerns regarding the reach of the right of self-representation, call for a cautious interpretation of *Faretta.*

█ Put differently, the right to self-representation is not absolute. There may be times, during both the guilt phase and penalty phase, when the defendant will be required to cede control of his defense to protect the integrity of the State's interest in fair trials and permit courts to ensure that their judgments meet the high level of reliability demanded by the Constitution. The following discussion concerning a pro se defendant's waiver of counsel and the requirement of standby counsel will assist courts in navigating the divide when the defendant's interests diverge from those of the public.

III.

*Knowing and Voluntary Waiver*

█ A defendant may invoke the right to self-representation only if he makes a knowing and voluntary waiver of counsel.

Because we are reversing defendant's conviction on other grounds, we do not need to decide whether the trial court in this matter erred in denying defendant's motion to proceed pro se. We nonetheless provide guidance on this issue because it may arise again in this and other cases.

### A.

We set forth excerpts from the proceedings below to provide context for our discussion. At the hearing held on defendant's motion to appear pro se, he acknowledged that he faced murder and felony-murder charges. When asked by the court if he believed that he would be able to defend himself "in such an awesome proceeding as this," defendant stated that he did.

The court then asked:

Q. Do you understand that as both the lawyer and the accused, it would be difficult to represent yourself?

A. Only—I don't see how difficult—I don't feel it would be difficult for me to represent myself.

The trial court explained that it had to ensure that defendant was aware that his statements, including his confessions, could be used against him, ultimately leading to his conviction.

When the trial court asked defendant about his challenging of the statements, defense counsel objected that the question touched upon defense strategy. This discussion ensued:

THE COURT: Well, I have to make sure that he understands that the jury can tend to infer that he has knowledge of incriminating evidence, and I have to—I realize that this is a difficult situation, but *State [v.] Crisafi* makes it pretty clear that I have to be penetrating in my interrogation to appreciate the fact that a defendant, particularly in a case where he stands eligible for capital punishment, understands the fine line because ... the point that I'm driving at and where I'm going, I mean, there's no secrets here, as you can appreciate the sensitivity right now, what happens if the defendant begins to ask questions which tend toward testimony so that the prosecution establishes that the defense has now waived its privilege?

[DEFENSE COUNSEL]: I understand, Your Honor, and I don't want to argue Your Honor's point because I don't want to argue Mr. Reddish's point because it's against my advice, but the issue here is whether or not his waiver is knowing and

intelligent, not what would happen in given various circumstances during the course of the trial.

THE COURT: But if it's not understood by him, then it's not knowing that he's waiving his right to counsel. So, knowingly is very much a part of my questioning right now.... Does he know what he's doing by not taking himself out of the interrogation process when the primary focus of this case is going to be the very statements that he's alleged to have made that he is now going to have to challenge?

. . . .

So, my primary questioning right now is not to ask him to divulge his strategy, but I have to almost raise the point that if you were to do something like this, do you understand what is going to be involved.

Defendant stated that he understood that questions concerning his confessions "could or could not potentially [affect] the outcome of the trial." When asked if he understood that the jury could infer, based on the nature of his questions, that he had personal knowledge of the matter, and therefore could potentially incriminate himself, defendant replied, "Yes, I do."

The following exchange also occurred between the court and defendant:

Q. And although you presently have been assigned counsel not only to represent you through the trial of this case, but also to counsel you in regard to the capital aspects of this case, you believe that it would be more beneficial to you to waive that right to those counsels and to represent yourself?

A. I think it would be in my best interest, Your Honor.

Q. You understand it would be especially hard for you to avoid making comments if you choose to cross-examine witnesses, particularly the officer who took your statement prior to the trial?

A. Hard for me to what?

The trial court explained and the defendant said, "I understand."

The court then discussed the dangers of self-incrimination. The court asked defendant on a number of occasions if he understood those risks, to which defendant replied variously, "I understand that"; "Yes, Your Honor"; and "I do understand the procedures in having a trial."

Following this last response, the court indicated:

Q. I'm not concerned about your understanding as much I'm concerned about your intelligent and fully knowledgeable waiver of your right to an attorney when that decision is being made without a full appreciation of your ineffective ability to

represent yourself based on the nature of this case. And I want to make sure you understand that point because I've got to try and show you why I don't think you can do it.

A. Well, Your Honor, I've seen enough of the attorneys to know that more or less I could do a better job than they can.

Q. It's sort of that general feeling about things, isn't it?

A. More than a general feeling, Your Honor.

Q. And the fact that you can do a better job or a worse job isn't for me to decide, because even if it's a worse job and I feel that you would, that's not the question. It's your knowing waiver because you understand and appreciate the ineffective presentation of facts that may not be elicited through you since you would otherwise be testifying at a time when you have a right not to testify....

Defendant stated: "I understand that Your Honor is giving me more than enough warnings here and showed me how things could hurt me by my self representation, and I still am certain and sure that I would rather proceed to represent myself other than have someone else, counsel, represent me."

The trial court began its ruling on the matter with the following observations:

I'm satisfied that Mr. Reddish does understand the nature of the charges against him, and I understand that he is sufficiently intelligent to even understand the defenses. However, this is not even what I say and not out of any cavalier approach to capital cases, because obviously the seriousness of it warrants perhaps not even this kind of a statement, but it's important, that this is not the garden variety capital case. It's not the garden variety case of any kind.

This case rises and falls upon the very statements made by the defendant who is now asking for the opportunity to question witnesses regarding the factual content—strike that—which could result in the defendant cross-examining witnesses who I have already heard testify in preliminary matters as to the factual content of the statements, as to the voluntariness of the statements.

I have no question about his ability to cross-examine, at least from a standpoint of competency, but competency isn't the question. Competency is a full awareness and understanding of the case itself so that there can be an intelligent and effective waiver of his right to counsel. No court could ever stand in the position that I'm in, not today, but having enough, and it's not clairvoyance, but foresight to appreciate that trial procedure, one in which we've all been involved if we've ever tried cases where as a case unfolds it's not the prepared set of questions before you, it's not what my next question is going to be, it's what I'm compelled to do because of something that has just unfolded that must be done in order to protect the interest of my client. And that has to sometimes be that question of import that may not have even been thought about at the time, or if it was, it was not going to be used.

The court stressed that it was not basing its decision to deny the request for self-representation on defendant's ability to represent himself. Rather, the court found that defendant did not truly understand the problem. That is, in attempting to challenge his own confession by questioning witnesses who recorded his statements, defendant might reveal facts that could incriminate himself, which in turn might expose him to cross-examination at trial. The court reasoned that defendant's "feeling that he can do a better job than his attorney," and defendant's assurances that he would "do [his] best not to fall into that kind of a problem," did not amount to a sufficient understanding to effectively waive his right to counsel. The court thus denied the motion.

Following the guilt-phase trial, at a hearing on defendant's motion for a new trial, the court again expressed its reasons for denying the motion to proceed pro se. It noted that the purpose of the warnings was to ensure that defendant understood the consequences of such a waiver and that the "ultimate focus must be on the defendant's actual understanding of the waiver of counsel [and] not just the judge's strict compliance with the requirements."

The court further explained:

[D]espite his comprehension of the nature of the charges, which I found that he does have, and the available defenses I find he did note to be utilized, I find he would face tremendous difficulty with respect to these two confessions and I was gravely concerned about the potential for self incrimination that would be attendant to his proceeding pro se. I'm satisfied that his inability to fully comprehend the inherent pitfalls that are involved in representing himself that were the center piece [sic] of the State's case were his own incriminating statements and the underpinning upon which this Court denied the defendant's motion to proceed pro se was an appropriate determination by this Court.

## B.

The trial court thus held an extensive inquiry to determine whether defendant's waiver of his right to counsel was knowing and intelligent. Indeed, our survey of the case law suggests that the trial court conducted a far more detailed inquiry and analysis than generally occurs. Irrespective of whether the motion to

proceed pro se was properly denied in this case, which is not our focus, the summary of the colloquy, comments, and conclusions demonstrates the challenges that trial courts, attorneys, and defendants often encounter when motions for self-representation are raised. The Eighth Circuit noted the dilemma presented when a defendant requests to waive counsel:

> The tension created by the mutual exclusivity of the right to counsel and the right to self-representation places a trial court in a precarious position. If it grants a request for self-representation, the defendant can argue on appeal that she did not knowingly and intelligently waive her right to counsel. On the other hand, if a trial court denies a request for self-representation, the defendant can argue on appeal that she was denied her *Faretta* right.
>
> [*Reese v. Nix*, 942 *F*.2d 1276, 1280 (8th Cir.1991), *cert. denied*, 502 *U.S.* 1113, 112 *S.Ct.* 1220, 117 *L.Ed*.2d 457 (1992).]

To help minimize, if not eliminate, those problems, we offer the following guidance.

 Although considered the "exception," waiver of counsel by a criminal defendant is nonetheless possible when the waiver is knowing and intelligent. The Supreme Court has stated that the competence necessary to make a knowing and intelligent waiver of counsel is different from the competence to conduct a defense. *Godinez v. Moran*, 509 *U.S.* 389, 399, 113 *S.Ct.* 2680, 2686–87, 125 *L.Ed*.2d 321, 332 (1993). "[T]echnical legal knowledge, *as such*, [is] not relevant to the assessment" of whether a defendant can represent himself. *Faretta, supra*, 422 *U.S.* at 836, 95 *S.Ct.* at 2541, 45 *L.Ed*.2d at 582 (emphasis added). However, we emphasize "as such" to underscore that in order for a defendant to waive the assistance of counsel in a knowing and intelligent way, he also must know in a basic fashion the fundamental legal rights and issues that will be affected by his decision. Put differently, although a court should not focus on whether a pro se defendant will fare well or badly, it must ensure that he knows and understands that, by his choice, he may not do well. He cannot make a knowing and intelligent waiver unless he understands the nature and implications of his waiver so that the "choice is made with eyes open." *Id*. at 835, 95 *S.Ct.* at 2541, 45 *L.Ed*.2d at 582 (internal quotation marks omitted).

In *State v. Crisafi*, this Court set forth the areas of inquiry a trial court must explore to determine whether a defendant has made a knowing and intelligent waiver of the right to counsel. 128 *N.J.* 499, 509–12, 608 *A.*2d 317 (1992). We explained that trial courts should advise defendants "of the dangers and disadvantages of self-representation." *Id.* at 510, 608 *A.*2d 317 (quoting *Faretta, supra,* 422 *U.S.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 582). Drawing on United States Supreme Court jurisprudence, we required courts, before allowing a defendant to waive counsel, to "make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." *Ibid.* (quoting *Von Moltke v. Gillies,* 332 *U.S.* 708, 724, 68 *S.Ct.* 316, 323, 92 *L.Ed.* 309, 321 (1948) (plurality opinion)). A court must inform a defendant "of the nature of the charges against [him], the statutory defenses to those charges, and the possible range of punishment." *Id.* at 511, 608 *A.*2d 317. The court must also apprise defendant "of the technical problems [he] may encounter in acting as [his] own counsel and of the risks [he] take[s] if [his] defense is unsuccessful." *Id.* at 511–12, 608 *A.*2d 317. Additionally, we instructed that courts "should inform the defendants that they must conduct their defense in accordance with the relevant rules of criminal procedure and evidence, that a lack of knowledge of law may impair their ability to defend themselves, and that their dual role as attorney and accused might hamper the effectiveness of their defense." *Id.* at 512, 608 *A.*2d 317. We further explained that courts must advise defendants of the difficulties they will encounter in acting as their own counsel and that "it would be unwise not to accept the assistance of counsel." *Ibid.*

## C.

We take this opportunity to amplify our directive in *Crisafi, supra,* that courts engage in a penetrating examination of the knowingness and intelligence of a defendant's attempted waiver of the assistance of counsel. *Id.* at 510–11, 608 *A.*2d 317. We

encourage trial courts to explore subjects that are inherent in, or offshoots of, those identified in *Crisafi*. By way of illustration, those additional areas would include whether defendant will experience difficulty in separating his roles as defendant and counsel; whether defendant understands that he not only has the right not to testify, but also the right not to incriminate himself in any manner; whether he understands that he could make comments as counsel from which the jury might infer that he had knowledge of incriminating evidence (and the difficulty in avoiding such comments); and whether he fully understands that if he crosses the line separating counsel from witness, he may forfeit his right to remain silent and subject himself to cross-examination by the State.

In its discussion with a defendant, the trial court also must advise defendant that if the court allows him to represent himself, he will thereby waive any and all later claims that his self-representation constituted ineffective assistance of counsel. *See Faretta, supra,* 422 *U.S.* at 835 n. 46, 95 *S.Ct.* at 2541 n. 46, 45 *L.Ed.*2d at 581 n. 46 ("[A] defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of effective assistance of counsel.") (internal quotation marks omitted). Further, as with all areas of inquiry regarding the decision to waive counsel, the trial court must question defendant to ascertain whether he actually understands the nature and consequences of his waiver. *See Godinez, supra,* 509 *U.S.* at 401 n. 12, 113 *S.Ct.* at 2687 n. 12, 125 *L.Ed.*2d at 333 n. 12 ("The purpose of the 'knowing and voluntary' inquiry . . . is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision in uncoerced.") (citing *Faretta, supra,* 422 *U.S.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581). The trial court must explore fully the bona fides of a defendant's claim of "knowingness." It must determine whether a defendant's "understanding" is real or feigned. Courts must be sensitive, as this trial court was, to attempts by a defendant to claim "knowingness" merely to assuage the court's concerns about the consequences of pro se

representation. To that end, beyond a defendant's mere yes or no response, the court must make appropriate credibility determinations bottomed on specific facts, observations, and conclusions. The court must ask appropriate open-ended questions that will require defendant to describe in his own words his understanding of the challenges that he will face when he represents himself at trial. For example, a defendant may be required to explain what difficulties he believes he will confront or create when he examines or cross-examines witnesses. Accordingly, the trial court must conduct separate inquiries concerning waiver of counsel before both the guilt and penalty phases in the event defendant seeks to appear pro se in both phases. The court should adjust its questions and analyses to meet the circumstances and exigencies in each instance. Its inquiry before the penalty phase may warrant questions beyond those posed before the guilt phase.

We stress that we are not requiring defendants to "have the skill and experience of a lawyer in order competently and intelligently to choose self-representation." *Faretta, supra,* 422 *U.S.* at 835, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 581–82. Nor are we even requiring any "technical legal knowledge." *Id.* at 836, 95 *S.Ct.* at 2541, 45 *L.Ed.*2d at 582.

As our opinion recognizes, a defendant who waives counsel jeopardizes his constitutional right against self-incrimination, and, thus, his liberty. The requirement that a defendant's waiver of counsel be "knowing" would ring hollow if courts did not take extensive prophylactic measures to assess a defendant's understanding of those rights. In offering this additional guidance, we have confidence that our courts will exercise sound discretion in determining whether the waiver is knowing and intelligent given the unique circumstances of each case.

IV.

*Standby Counsel*

Requiring trial courts to conduct inquiries concerning waiver, however, does not ameliorate all of the difficulties presented when

a defendant appears pro se during a death penalty case. More than seventy years ago, the United States Supreme Court identified the unease with which our legal system regards pro se defendants:

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.
>
> [*Powell v. Alabama*, 287 *U.S.* 45, 69, 53 *S.Ct.* 55, 64, 77 *L.Ed.* 158, 170 (1932).]

Echoing those truths, we conclude that the risks facing a defendant in these circumstances, as well as our abiding interest in ensuring that justice is done, necessitates that we implement an added protection: mandatory standby defense counsel in capital cases.

 In the discussion that follows, we first assess the practice of appointing standby counsel and the limitations placed on standby counsel's participation. Next, we address the demands that the administration of the death penalty places on both pro se defendants and courts. We then recount our State's tradition of ensuring fair trials in capital cases. Finally, we hold that if a defendant seeks to represent himself, and knowingly and intelligently waives counsel, the court should appoint standby counsel in both the guilt and penalty phases of the proceeding.

## A.

We begin by examining the jurisprudence both authorizing standby counsel's participation in criminal proceedings and restricting the scope of that participation. The idea of using standby counsel to assist pro se defendants is not new. Even in *Faretta, supra,* the benchmark for a defendant's right to represent himself, the Court acknowledged that trial courts may wish to

appoint standby counsel. 422 *U.S.* at 834 n. 46, 95 *S.Ct.* at 2540 n. 46, 45 *L.Ed.*2d at 581 n. 46. The Court explained:

[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.

[*Ibid.* (citations omitted).]

*See also McKaskle, supra,* 465 *U.S.* at 176, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132 ("[N]o absolute bar on standby counsel's unsolicited participation is appropriate or was intended" by *Faretta.*). That invitation has been accepted by many federal and state courts, including this Court. *See, e.g., State v. Davenport,* 177 *N.J.* 288, 300, 827 *A.*2d 1063 (2003); *United States v. Bertoli,* 994 *F.*2d 1002, 1016–17 (3d Cir.1993); *Com. v. Molino,* 411 *Mass.* 149, 580 *N.E.*2d 383, 385 n. 4 (1991). Nor is it novel that appointment of standby counsel is made compulsory in certain categories of cases. *See United States v. Welty,* 674 *F.*2d 185, 193 n. 5 (3d Cir.1982) ("Standby counsel should always be appointed in cases expected to be long or complicated or in which there are multiple defendants.") (quoting American Bar Association, *Standards for Criminal Justice* § 6–3.7 (2d ed. 1980) (*ABA Standards* )).

Standby counsel's participation, however, is not without limitation. In *McKaskle, supra,* the Court, while reaffirming its endorsement of the use of standby counsel, recognized that "the *Faretta* right must impose some limits on the extent of standby counsel's unsolicited participation." 465 *U.S.* at 177, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 133. The Court delineated circumstances that called for two different restrictions on standby counsel's participation. First, standby counsel is prohibited from conduct that substantially interferes with the defendant's trial strategy. *Id.* at 178, 104 *S.Ct.* at 951, 79 *L.Ed.*2d at 134. The defendant's self-representation right is "adequately vindicated" in this scenario so long as he can freely address the court on his own behalf, and the court resolves disputes between standby counsel and the defendant in the defendant's favor "whenever the matter is one that would normally be left to the discretion of counsel." *Id.* at 179,

104 *S.Ct.* at 951, 79 *L.Ed.*2d at 134. Second, when proceedings occur before an empanelled jury, standby counsel must not destroy the appearance that the defendant is conducting his own defense. *Id.* at 178–79, 104 *S.Ct.* at 951, 79 *L.Ed.*2d at 134. Although the Court characterized this scenario as "more problematic," it nonetheless concluded that "a categorical bar on participation by standby counsel in the presence of the jury is unnecessary." *Id.* at 181–82, 104 *S.Ct.* at 953, 79 *L.Ed.*2d at 135; *see also Martinez, supra,* 528 *U.S.* at 162, 120 *S.Ct.* at 691, 145 *L.Ed.*2d at 607 (justifying appointment of standby counsel by noting that "ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"). Providing further guidance, the Court demarcated some of the generally permissible activities standby counsel can conduct:

> *Faretta* rights are also not infringed when standby counsel assists the pro se defendant in overcoming routine procedural or evidentiary obstacles to the completion of some specific task, such as introducing evidence or objecting to testimony, that the defendant has clearly shown he wishes to complete. Nor are they infringed when counsel merely helps to ensure the defendant's compliance with basic rules of courtroom protocol and procedure. In neither case is there any significant interference with the defendant's actual control over the presentation of his defense. The likelihood that the defendant's appearance in the status of one defending himself will be eroded is also slight, and in any event it is tolerable.
>
> [*McKaskle, supra,* 465 *U.S.* at 183, 104 *S.Ct.* at 953–54, 79 *L.Ed.*2d at 136–37.]

In *Davenport, supra,* we considered *McKaskle's* articulation of the role of standby counsel. Proceeding pro se during the guilt phase of a prosecution for drug-related offenses, the defendant contended that standby counsel's participation in a series of sidebar conferences from which the defendant was excluded violated his *Faretta* right. *Davenport, supra,* 177 *N.J.* at 302–03, 827 *A.*2d 1063. We disagreed, explaining that a "fact-sensitive analysis," *id.* at 308, 827 *A.*2d 1063, revealed that neither prong of the *McKaskle* limitations had been breached, *id.* at 303–07, 827 *A.*2d 1063. As we noted, the trial court may obtain standby counsel's participation, even though the defendant does not request it, "through minimal use of standby counsel as a conduit, by sending the jury to the jury room and having the discussion in open court

..., or even through advances in courtroom technology." *Id.* at 309, 827 *A.*2d 1063.

### B.

We now consider the difficulties that inhere in self-representation during capital trials. We note that, unlike *McKaskle* and *Davenport,* Charles Reddish's prosecution resulted in a death sentence. As we have observed, the United States Supreme Court and this Court have developed a "highly complex body of law" to effectuate the guarantees of the Eighth Amendment. *State v. Davis,* 116 *N.J.* 341, 354, 561 *A.*2d 1082 (1989). Foremost among them are the demands placed on counsel, for whom "[c]apital cases present an extraordinary challenge." *Ibid.* As Justice Marshall stated: "Death penalty litigation has become a specialized field of practice, and even the most well intentioned attorneys often are unable to recognize, preserve, and defend their client's rights. Often trial counsel simply are unfamiliar with the special rules that apply in capital cases." *Ibid.* (quoting Justice Thurgood Marshall, *Remarks on the Death Penalty Made at the Judicial Conference of the Second Circuit,* 86 *Colum. L. Rev.* 1, 1 (1986)).

Further, as the United States Supreme Court discussed in *Wiggins v. Smith,* "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence,' " covering topics as diverse as "medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." 539 *U.S.* 510, 524, 123 *S.Ct.* 2527, 2537, 156 *L.Ed.*2d 471, 486–87 (2003) (internal quotation marks and emphasis omitted); *see also Guidelines, supra,* § 10.11 cmt. at 109 (noting "poverty and abuse that characterize the lives of many capital defendants"). However, a pro se defendant may be unwilling or unable to investigate, much less present, the mitigating evidence necessary to ensure that death sentences are not "wantonly and ... freakishly imposed." *Furman, supra,* 408

*U.S.* at 310, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 390 (Stewart, J., concurring).

Far from being harmless oversight, an inadequate and incompetent presentation by a pro se defendant in a penalty trial unacceptably poses a risk to the State of executing a defendant whose individual character and record do not warrant the ultimate punishment. The most "solemn business" of executing a human being cannot be "subordinate[d] . . . to the whimsical—albeit voluntary—caprice of every accused who wishes" unwisely to represent himself. *Faretta, supra,* 422 *U.S.* at 849, 95 *S.Ct.* at 2548, 45 *L.Ed.*2d at 590 (Blackmun, J., dissenting). Although *Faretta, supra,* discounted the fact that most pro se defendants would fare better with counsel's guidance, *see id.* at 834, 95 *S.Ct.* at 2540, 45 *L.Ed.*2d at 581, courts must recognize that unrestrained self-representation in capital trials has the potential to beget "state aided suicide," *Massie v. Sumner,* 624 *F.*2d 72, 74 (1980) (quoting *Commonwealth v. McKenna,* 476 *Pa.* 428, 383 *A.*2d 174, 181 (1978)). Honoring an incautious defendant's choice to exercise his self-representation right does not mean a court must fulfill his death wish. That observation may overstate the dilemma in situations where the defendant sincerely believes that he can adequately represent himself. Yet, it is at least true, in some cases, that a well-intentioned defendant who proceeds pro se helps to execute his own death warrant.

In sum, it is the difficulties we have described, coupled with our awareness of the gravitas that accompanies capital trials, that inform our decision.

### C.

New Jersey has long had a tradition of ensuring fair trials for capital defendants. Mindful, then, of our charge to balance fairness in capital trials with respect for a defendant's right to self-determinism, we pause to recount several of this Court's prior holdings that undergird our decision today. Because of the irreversible consequence of capital punishment, this State has adhered

to the United States Supreme Court's directive that "capital punishment be imposed fairly, and with reasonable consistency, or not at all." *Eddings v. Oklahoma,* 455 *U.S.* 104, 112, 102 *S.Ct.* 869, 875, 71 *L.Ed.*2d 1, 9 (1982). In accordance with "the fundamental respect for humanity underlying the Eighth Amendment," *ibid.* (quoting *Woodson v. North Carolina, supra,* 428 *U.S.* at 304, 96 *S.Ct.* at 2991, 49 *L.Ed.*2d at 961), we are constitutionally obliged to provide "heightened reliability ... in the determination whether the death penalty is appropriate in a particular case," *Sumner v. Shuman, supra,* 483 *U.S.* at 72, 107 *S.Ct.* at 2720, 97 *L.Ed.*2d at 63. Although we respect defendant's autonomy in decisions of representation, we nevertheless have adhered to our heightened obligation to ensure "consistency and reliability in the administration of capital punishment," *State v. Ramseur,* 106 *N.J.* 123, 190, 524 *A.*2d 188 (1987), and to implement "meaningful appellate review," *State v. Martini,* 144 *N.J.* 603, 613, 677 *A.*2d 1106 (1996) (*Martini III* ) (quoting *Gregg v. Georgia, supra,* 428 *U.S.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 886–87). In *Ramseur, supra,* we underscored the amplified duty to provide a fair trial when a defendant faces death: "In the context of the death penalty, *where the demands for fairness and accuracy are heightened,* the principles of consistency and reliability rise to constitutional dimension." 106 *N.J.* at 190, 524 *A.*2d 188 (emphasis added). Accordingly, we recognized that "[h]ard cases there will be, but we have always believed that the judiciary's role in such cases is to find the right answer, not to shrink from our responsibility to apply the law." *Id.* at 191, 524 *A.*2d 188.

We have also held that, despite his desires to the contrary, a defendant cannot block the presentation of mitigating evidence at capital sentencing nor can he waive his automatic appeal. *State v. Koedatich* 112 *N.J.* 225, 332, 548 *A.*2d 939 (1988) (*Koedatich I* ). We observed that the State has an "interest in a reliable penalty determination." *Id.* at 330, 548 *A.*2d 939 (quoting *People v. Deere,* 41 *Cal.*3d 353, 222 *Cal.Rptr.* 13, 710 *P.*2d 925, 931 (1985)). That reliability interest, in turn, provides "persuasive policy reasons" for disregarding a defendant's admittedly "knowing and voluntary

waiver of his right to present mitigating evidence during the penalty phase." *Id.* at 329–30, 548 *A.*2d 939. We quoted with approval an opinion of the Appellate Division:

> Under our statutory scheme, a jury may impose the death penalty only if the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. If the jury did not hear the evidence allegedly in mitigation, it could have difficulty discharging its statutory, and indeed moral, duty.
>
> [*Id.* at 330, 548 *A.*2d 939 (quoting *State v. Hightower,* 214 *N.J.Super.* 43, 45, 518 *A.*2d 482 (App.Div.1986)).]

*Koedatich I* ultimately held that a defendant cannot waive the presentation of mitigating evidence. *Id.* at 332, 548 *A.*2d 939. "A defendant who prevents the presentation of mitigating evidence 'withholds from the trier of fact potentially crucial information bearing on the penalty decision no less than if the defendant was himself prevented from introducing such evidence by statute or judicial ruling.' " *Id.* at 331–32, 548 *A.*2d 939 (quoting *Deere, supra,* 222 *Cal.Rptr.* 13, 710 *P.*2d at 931). We emphasized that "the state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty. Accordingly, we have the constitutional and statutory duty to review every judgment of death." *Id.* at 332, 548 *A.*2d 939. As *Koedatich I* demonstrates, a defendant's freedom to direct his own defense must on occasion give way to the State's interest in providing that defendant with a fair trial.

Similarly, in *Martini III, supra,* we rejected the defendant's request that we dismiss the application for post-conviction relief filed on the defendant's behalf by the Office of the Public Defender. 144 *N.J.* at 606, 613–14, 677 *A.*2d 1106. Summarizing the requirements of the United States Supreme Court, we noted that, for a state's capital sentencing statute to be constitutional, the sentencing jury must be presented with evidence of mitigating factors so that it may make an individualized determination that capital punishment should be imposed. *Id.* at 613, 677 *A.*2d 1106 (citing *Gregg, supra,* 428 *U.S.* at 192, 96 *S.Ct.* at 2934, 49 *L.Ed.*2d at 885; *Eddings, supra,* 455 *U.S.* at 110–12, 102 *S.Ct.* at 874–75, 71 *L.Ed.*2d at 8–9). In addition, "the further safeguard of meaningful

appellate review [must be] available to ensure that death sentences are not imposed capriciously...." *Ibid.* (quoting *Gregg, supra,* 428 *U.S.* at 195, 96 *S.Ct.* at 2935, 49 *L.Ed.*2d at 886–87).

As in *Koedatich I, supra,* we concluded in *Martini III, supra,* that meaningful appellate review—this time in the form of post-conviction relief—was vital to safeguarding the reliability of capital sentencing. *Id.* at 613–14, 677 *A.*2d 1106. Justice O'Hern, writing for the Court, explained that

> under our form of government it is not the inmate on death row or the accused who determines when and whether the State shall execute a prisoner; rather, the law itself makes that determination. *The public has an interest in the reliability and integrity of a death sentencing decision that transcends the preferences of individual defendants.*
>
> [*Id.* at 605, 677 *A.*2d 1106 (emphasis added).]

We acknowledged that other states have permitted condemned inmates to waive post-conviction review, but concluded that, regardless of the inmate's desire, this State's Constitution requires our courts to "ensure the integrity of death sentences in New Jersey." *Id.* at 613–14, 677 *A.*2d 1106.

It is the tradition of *Ramseur, Koedatich I,* and *Martini III* that enlightens both our discussion and our decision. We simply are not permitted to avert our eyes from the fairness of a proceeding in which a defendant has received the death sentence. The right to a fair trial in a capital proceeding is paramount to the right of self-representation, and the trial court has the responsibility to ensure that fairness. It is incumbent upon a trial court, therefore, to intercede in the proceedings if it becomes apparent that the defendant's representation of himself falls below minimal standards of acceptability.

### D.

In accordance with our duty to ensure fairness and reliability in the administration of the death penalty, we shall require that whenever a trial court permits pro se representation in a capital case, whether in the guilt phase, the penalty phase, or both, it also must appoint standby counsel, who will be available and must be

prepared to assist the defendant with his defense. Standby counsel may be called upon at times to provide unsolicited guidance to the defendant and the trial court. *Davenport, supra,* 177 *N.J.* at 300, 827 *A.*2d 1063 ("[A] pro se defendant has no absolute right to bar standby counsel's unsolicited participation." (citing *McKaskle, supra,* 465 *U.S.* at 176, 104 *S.Ct.* at 950, 79 *L.Ed.*2d at 132)); *cf. Koedatich I, supra,* 112 *N.J.* at 336, 548 *A.*2d 939 ("[W]e [do not] foreclose the possibility that cases may arise in which the trial court may have to compel defense counsel to present the mitigating evidence despite a client's instructions to the contrary.") As we have observed: "Participation by [standby] counsel to steer a defendant through the basic procedures of trial is permissible even in the unlikely event that it somewhat undermines the pro se defendant's appearance of control over his own defense." *Davenport, supra,* 177 *N.J.* at 301, 827 *A.*2d 1063 (quoting *McKaskle, supra,* 465 *U.S.* at 184, 104 *S.Ct.* at 954, 79 *L.Ed.*2d at 137).

A pro se defendant's egregious lapses in judgment may necessitate more active participation by standby counsel. For example, the failure of a pro se defendant to present mitigating evidence has constitutional ramifications. Imposing a sentence of death requires that mitigating evidence be presented to the sentencers so that they may make an individualized determination that the defendant indeed deserves death. *Koedatich I, supra,* 112 *N.J.* at 332, 548 *A.*2d 939; *Martini III, supra,* 144 *N.J.* at 613, 677 *A.*2d 1106. Although a pro se defendant is entitled to maintain control over his defense strategy, waiver of the presentation of mitigating evidence is simply not subject to the defendant's discretion. *See Koedatich I, supra,* 112 *N.J.* at 331–32, 548 *A.*2d 939. Should standby counsel become aware that defendant does not intend to present exculpatory or mitigating evidence, counsel should bring that lapse to the attention of the pro se defendant and the court in order to ensure the fairness of the proceeding. *See ABA Standards, supra,* § 6–3.7 (standby counsel may "call the judge's attention to matters favorable to the accused"); *May-*

*berry v. Pennsylvania*, 400 *U.S.* 455, 467–68, 91 *S.Ct.* 499, 506, 27 *L.Ed.*2d 532, 541 (1971) (Burger, C.J., concurring) ("[A] trial judge is well advised—as so many do—to have such standby counsel to perform all the services a trained advocate would perform ordinarily. . . .").

We are aware of at least one federal appellate court that has concluded that standby counsel may not present mitigating evidence over the pro se defendant's objection. *See United States v. Davis*, 285 *F.*3d 378, 385 (5th Cir.), *cert. denied*, 537 *U.S.* 1066, 123 *S.Ct.* 618, 154 *L.Ed.*2d 555 (2002). The Fifth Circuit concluded that because the "core" of a defendant's *Faretta* right is "his ability to preserve control over the case he chooses to present to the jury," this right must be honored during the penalty phase "regardless of whether society would benefit from having a different presentation of the evidence." *Ibid.* We respectfully disagree. In our view, it is difficult to square that conclusion with the Supreme Court's mandate in *Gregg, supra,* and *Eddings, supra,* that to constitutionally impose a death sentence, the sentencing jury cannot be deprived of an opportunity to make an individualized judgment based on a fair presentation of mitigating evidence.

We add that the trial court should not hesitate to "inform[ ] and repeatedly remind[ ] the jury that defendant [is] representing himself." *Davenport, supra,* 177 *N.J.* at 306, 827 *A.*2d 1063. Further, if it becomes necessary, the court should consider dismissing the jury in order to confer with both the defendant and standby counsel in order to avoid affecting the jury's perception of the defendant's control over his defense. *See id.* at 304, 309, 827 *A.*2d 1063. We emphasize that should a pro se defendant solicit or acquiesce in particular modes of participation by standby counsel, that defendant will have "substantially undermine[d] later protestations that counsel interfered unacceptably." *McKaskle, supra,* 465 *U.S.* at 182, 104 *S.Ct.* at 953, 79 *L.Ed.*2d at 136.

Finally, in the event that the defendant's conduct unmistakably prevents a fair trial, the court should order standby

counsel to undertake the defense. *See Faretta, supra,* 422 *U.S.* at 834 n. 46, 95 *S.Ct.* at 2540 n. 46, 45 *L.Ed.*2d at 581 n. 46; *see also Massie, supra,* 624 *F.*2d at 74 (noting role of standby counsel in preserving "public interest in the fairness and integrity of the proceedings"). The Eighth Amendment proscription against death sentences that are "freakishly imposed" demands nothing less. *Furman, supra,* 408 *U.S.* at 310, 92 *S.Ct.* at 2763, 33 *L.Ed.*2d at 390 (Stewart, J., concurring).

The implementation of the process that we have detailed in this opinion may be difficult at times. Our procedure calls for trial courts to be flexible in their approach and to balance a defendant's qualified right to proceed pro se with the State's interest in a fair trial.

## V.

Defendant contends the trial court erred in admitting evidence that defendant was in custody on unrelated charges when he confessed to Rosenthal's murder. Defendant also maintains that the trial court erred in its instructions on the inability of the police to locate the victim's body. We agree and find that, cumulatively, those errors warrant reversal of the conviction.

## A.

### Other–Crimes Evidence

As noted above, in October 1995, defendant was arrested in Burlington County for the murder of his girlfriend, Rebecca Wertz, and on other charges. After learning of the arrest from a television newscast, detectives from the Cherry Hill Police Department made arrangements with the Burlington County Prosecutor's office to interview defendant. On October 11, 1995, defendant confessed to killing Rosenthal, both to the police and, later that day, in an interview with a newspaper reporter, John Knarr.

Defendant moved *in limine* to preclude the State from introducing in the guilt phase any evidence relating to his killing of Wertz,

arguing that the admission of such prejudicial evidence would undermine the rationale for, and benefits of, bifurcating the guilt and sentencing phases of the trial. The State countered that the circumstances surrounding the statements, including the fact that defendant had been in custody for Wertz's murder when he confessed to killing Rosenthal, were admissible to buttress the credibility of defendant's confessions by placing them in context. The State wanted the jury to conclude that, as a consequence of being arrested for killing his girlfriend, defendant had "lost everything" and, with "nothing more to lose," had no reason to lie about killing Rosenthal.

Faced with those arguments, the trial court attempted to effect a compromise. The court ruled that the circumstances of the confessions were relevant in assessing their credibility. To minimize the prejudicial impact of that other-crimes information, the court ruled that evidence of defendant's incarceration had to be sanitized to eliminate any reference to defendant's arrest for the murder of Wertz. Consequently, the court allowed the State to present only "evidence indicating that the defendant was in custody for an unrelated charge ... without reference to the charge or other similar facts."

At trial, the jury learned that defendant was in custody on unrelated charges when he told both the Cherry Hill Police and reporter John Knarr that he had killed Rosenthal. Additionally, the prosecutor argued during summation that because defendant was in custody, he "had reached the end of the line. He couldn't hide from the truth any longer and he couldn't hide the truth any longer."

Defendant now argues on appeal that informing the jury that he had been under arrest for another crime at the time he confessed to the Rosenthal murder resulted in prejudice that outweighed the probative value of that information. Defendant also alleges that the trial court erred in its instructions to the jury on this matter. We agree.

Evidence relating to other crimes is handled with particular caution. Because of its potential for prejudice, it is inadmissible "to prove the disposition of a person in order to show that he acted in conformity therewith." *N.J.R.E.* 404(b); *see also State v. Koskovich,* 168 *N.J.* 448, 482, 776 *A.*2d 144 (2001) (observing that "[e]vidence of a defendant's other crimes, wrongs, or acts may not be admitted into evidence to prove a defendant's criminal disposition as a basis for proving guilt of the crimes charged"). As we have noted, "other-crime evidence has a unique tendency to turn a jury against the defendant," *State v. Stevens,* 115 *N.J.* 289, 302, 558 *A.*2d 833 (1989), and poses a "distinct risk" of distracting the jury from "an independent consideration of the evidence that bears directly on guilt itself," *State v. G.S.,* 145 *N.J.* 460, 468, 678 *A.*2d 1092 (1996) (citing *Stevens, supra,* 115 *N.J.* at 302, 558 *A.*2d 833). Although evidence of other crimes may be admitted for other purposes, its probative value must not be outweighed by the prejudice resulting from its introduction. *State v. Cofield,* 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992). More specifically, we have instructed trial courts to engage in a "careful and pragmatic evaluation" that focuses on "the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." *Stevens, supra,* 115 *N.J.* at 303, 558 *A.*2d 833. To assist trial courts in that endeavor, we fashioned a four-part test in *Cofield, supra,* "to avoid the over-use of extrinsic evidence of other crimes or wrongs." 127 *N.J.* at 338, 605 *A.*2d 230.

Other-crimes evidence thus necessitates a more searching inquiry than that required by *N.J.R.E.* 403. Under the latter rule, relevant evidence will be precluded only if the risk of undue prejudice *substantially* outweighs its probative value. *N.J.R.E.* 403(a). With respect to other-crimes evidence, however, the potential for undue prejudice need only outweigh probative value to warrant exclusion. *Cofield, supra,* 127 *N.J.* at 338, 605 *A.*2d 230; *Stevens, supra,* 115 *N.J.* at 302, 558 *A.*2d 833. Furthermore, under *N.J.R.E.* 404(b), the party seeking to admit other-

crimes evidence bears the burden of establishing that the probative value of the evidence is not outweighed by its apparent prejudice. *See State v. Long,* 173 *N.J.* 138, 162, 801 *A.*2d 221 (2002). Thus, "the primary focus of [*N.J.R.E.* 404(b)], when examined in conjunction with [*N.J.R.E.* 403], is to view it as a rule of exclusion rather than a rule of inclusion." *State v. Darby,* 174 *N.J.* 509, 520, 809 *A.*2d 138 (2002) (alteration in original) (quoting *State v. Marrero,* 148 *N.J.* 469, 482–83, 691 *A.*2d 293 (1997)).

Here, the trial court failed to analyze evidence that defendant was in custody at the time of the statements as other-crimes evidence. As a result, it did not apply the proper analysis, as set forth in *Cofield, supra;* rather, it incorrectly analyzed the issue under the more lenient *N.J.R.E.* 403 standard. When a trial court fails to employ the Cofield test to analyze the admissibility of other-crimes evidence, "no deference is to be accorded the trial court's decision to admit that evidence; nor is that decision entitled to be reviewed under an abuse of discretion standard." *Darby, supra,* 174 *N.J.* at 518, 809 *A.*2d 138. We, therefore, undertake a plenary review of whether the other-crimes evidence was admissible. *Ibid.*

Although it applied the wrong test, the trial court nonetheless realized the impermissible prejudice that would result from evidence indicating that defendant had been placed under arrest for the murder of Wertz at the time he admitted to killing Rosenthal. However, in attempting a compromise by ordering the facts relating to the arrest sanitized, the court failed to account for the concomitant diminution in relevance occasioned by the removal of those details. That is, the State desired the jury to hear that defendant had already been placed under arrest for murder. According to the State, that fact was essential for the jury to infer that defendant had nothing left to lose and confessed to unburden himself. The nature and details of the arrest—i.e., for the murder of his girlfriend, Wertz—thus proved pivotal to the relevance of the evidence as it was proffered by the State. It follows, then, that once the details underlying the "nothing left to lose" theory

were kept from the jury, the fact that defendant confessed while in custody on an "unrelated charge" had a diminished relevance to the credibility of defendant's statement.

Under the more careful balancing required for other-crimes evidence, that alteration in the calculus proves critical. Stripped of the details surrounding the arrest, the custodial nature of defendant's confession had little relevance. The probative value of that information was outweighed by the risk that the jury would conclude that defendant had a propensity to commit bad acts and, thus, killed Rosenthal. We conclude, therefore, that on these facts it was error to allow the jury to hear that defendant had been arrested for a separate, unrelated crime at the time he confessed to killing Rosenthal.

That conclusion becomes ineluctable when the admission of this evidence is viewed in the fuller context of other information presented at trial. In addition to hearing that defendant had been arrested on "charges unrelated to this case," the jury heard Detective Long testify that the Cherry Hill police learned of defendant's arrest in Burlington County through a television newscast. At another point in the trial, the jury also learned that Wertz was deceased. In combination, then, the jury knew that defendant's girlfriend was dead and that his arrest in Burlington County was of sufficient interest to be carried on television. In view of those circumstances, the risk, if not the likelihood, that a jury would infer that defendant was in custody for another murder foreseeably outweighed the marginal probative value of the custodial nature of his confession. Because the erroneous admission of this evidence may have "led the jury to a result it otherwise might not have reached," *State v. Bankston,* 63 *N.J.* 263, 273, 307 *A.*2d 65 (1973), we are unable to conclude that the error was harmless.

Moreover, the error in admitting this evidence was compounded by the lack of a proper limiting instruction. *See State v. Hernandez,* 170 *N.J.* 106, 131, 784 *A.*2d 1225 (2001); *Marrero, supra,* 148 *N.J.* at 496, 691 *A.*2d 293. As we explained in *State v. Fortin,*

because "the inherently prejudicial nature of such evidence casts doubt on a jury's ability to follow even the most precise limiting instruction," the court's instruction "should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere."

[162 *N.J.* 517, 534, 745 *A.2d* 509 (2000) (*Fortin I*) (citations omitted) (quoting *Stevens, supra,* 115 *N.J.* at 309, 304, 558 *A.2d* 833).]

The instruction at issue here failed to adequately guide the jury in its consideration of the evidence. The court informed the jury:

Ladies and Gentlemen of the jury, you have heard testimony that the defendant ... was in custody in Burlington County, New Jersey, on charges unrelated to this case at the time he gave a statement to personnel from the Cherry Hill Police Department and also to Mr. John Knarr of the Burlington County Times. The fact that the defendant was in custody at the time of those statements [in Burlington County] may be used by you only as it relates to the giving and taking of those statements and as it relates to your consideration of the statements themselves and the circumstances surrounding those statements. You are not to speculate as to the nature of the charges in Burlington County nor are you to consider that information for any other purpose other than as it relates to defendant's statements to the Cherry Hill detectives and to Mr. Knarr.

Although that directive addressed the permissible uses of the other-crimes evidence, it failed to explicitly caution the members against inferring from a single instance of bad conduct a propensity on behalf of defendant to commit crimes. An explicit instruction that the jury should not make any inferences about defendant's propensity to commit crimes is "an essential point to be made in the limiting instruction." *Marrero, supra,* 148 *N.J.* at 496, 691 *A.2d* 293. On these facts—involving the risk that the jury would conclude that defendant committed another homicide— such an omission posed too great a risk that evidence of defendant's "other crimes" influenced the jury's verdict. *See State v. Biegenwald,* 126 *N.J.* 1, 43–44, 594 *A.2d* 172 (1991) (*Biegenwald IV*) (noting "possible blinding impact" of evidence of defendant's prior murder conviction). In sum, the jury had evidence sufficient to infer that defendant had been arrested for the murder of his girlfriend at the time he confessed to killing Rosenthal. Therefore, and especially in the absence of a proper limiting instruction, the danger is simply too high that the jury impermissibly inferred that defendant had a propensity for unlawful conduct, in general,

and for homicide, in particular. Because the evidence that defendant was in police custody for "an unrelated charge" at the time he gave his statements had the capacity to prejudice the jury's deliberations, it should not have been admitted even in sanitized form. Before determining whether reversible error occurred, we turn to defendant's arguments concerning the court's instructions on the inability to locate the victim's body.

## B.

### *Instructions on "Lack of a Body"*

■ Defendant argues that the trial court's jury instruction concerning the lack of a body presented an unbalanced and misleading summary of the evidence. Specifically, defendant maintains that the court summarized only evidence unfavorable to him and ignored evidence in support of his version of events. The State counters that the court properly incorporated the facts necessary to guide the jury in its deliberations. After carefully reviewing the evidence presented at trial by both parties and the court's summary of that evidence, we agree with defendant and conclude that a new trial is warranted on this ground as well.

■ We have stated that a "trial judge has the right, and oftentimes the duty, to review the testimony and comment upon it, so long as he clearly leaves to the jury ... the ultimate determination of the facts and the rendering of a just and true verdict on the facts as it finds them." *State v. Mayberry,* 52 *N.J.* 413, 439, 245 *A.*2d 481 (1968). The need to comment on the evidence arises when an instruction modeled solely on the language of an applicable statute or rule of law will not adequately guide the jury's deliberations. *State v. Olivio,* 123 *N.J.* 550, 567–68, 589 *A.*2d 597 (1991). In those circumstances, "the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case...." *State v. Concepcion,* 111 *N.J.* 373, 379, 545 *A.*2d 119 (1988). But when a court delves into the facts, "any comment must be designed to avoid unduly influencing

or otherwise invading the province of the jury." *State v. Biegenwald*, 106 *N.J.* 13, 44, 524 *A.*2d 130 (1987) (*Biegenwald II* ). Thus, with respect to the relative strengths and weaknesses of the evidence, we have instructed that such arguments more properly emanate from counsel. *State v. Robinson*, 165 *N.J.* 32, 45, 754 *A.*2d 1153 (2000). If, however, a court finds it necessary to comment on the strengths of one party's case, it must refer to the opponent's counterarguments; conversely, if weaknesses are discussed, the countervailing explanations must be mentioned. *Ibid.*

It is difficult to overstate the importance of jury instructions. Indeed, "[a]ppropriate and proper charges are essential for a fair trial." *State v. Green*, 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981); *see also State v. Brown*, 138 *N.J.* 481, 522, 651 *A.*2d 19 (1994) (same), *overruled in part by, State v. Cooper*, 151 *N.J.* 326, 700 *A.*2d 306 (1997). It is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party. *State v. Thompson*, 59 *N.J.* 396, 411, 283 *A.*2d 513 (1971). Finally, "[a]s an indication of the paramount importance of accurate jury instructions, we have held that erroneous instructions on material issues are presumed to be reversible error." *State v. Marshall*, 173 *N.J.* 343, 359, 801 *A.*2d 1142 (2002) (*Marshall IV* ).

At issue here are the instructions concerning the inability of the State to locate Rosenthal's body. The court instructed the jury as follows:

The disappearance of Yeda Sharon Dede Rosenthal could support the inference of suicide, natural death, accidental death, or continued life *in absentia*. It can also support the inference that her disappearance was the result of a criminal act that caused or resulted in her death. As to continuing life *in absentia, you may[,] given the facility of worldwide travel and communications technology[,] properly take into account the unlikelihood of such event* in view of the evidence you have heard regarding Ms. Rosenthal's employment, her family relations, the failure of investigative efforts of the police, family, and friends to locate her, and any other evidence adduced during the course of the trial.

[ ]As to a cause of death other than by a criminal act, the fact that Ms. Rosenthal's body was never found can justify an inference that her death was in

> fact caused by a criminal act. It is highly unlikely that a person who dies from suicide or from natural causes will successfully dispose of her own body. While such a result may be a theoretical or hypothetical possibility, it is contrary to the normal course of human affairs. Therefore, in order for you to find the defendant guilty of murder and/or felony murder, the State must prove beyond a reasonable doubt that Yeda Sharon Dede Rosenthal was the victim of a homicide and is, therefore, dead. It is not necessary for the State to produce the body of Yeda Sharon Dede Rosenthal in order to establish her death[,] provided that you are satisfied from all the evidence in the case that she was the victim of a homicide. In fact, her disappearance alone is circumstantial evidence entitled to weight equal to that of any other circumstantial evidence. *The successful concealment or destruction of Ms. Rosenthal's body does not prevent or preclude you finding defendant guilty* of murder and/or felony murder so long as proof of Ms. Rosenthal's death and Mr. Reddish's guilt are established beyond a reasonable doubt.
> [ (Emphasis added).]

At the charge conference, defense counsel objected only to a portion of that instruction. Nevertheless, in view of the instruction's one-sided picture of the evidence produced at trial, we conclude that the charge was improper.

 As the theory of his defense, defendant argued that Ms. Rosenthal had not died but, instead, had disappeared of her own volition. To that end, he presented witnesses who claimed to have seen a woman fitting her description in a Jackson Township bar after the alleged homicide took place. He also presented evidence that Ms. Rosenthal had been experiencing financial difficulties and had been reported missing on prior occasions. However, despite the court's recounting of testimony adverse to defendant's theory—e.g., her family relations, employment history, and failed investigative efforts to locate her—the instructions made no mention of the evidence defendant proffered to rebut the State's proofs. We, of course, do not present any opinion on the credibility of defendant's witnesses or their testimony. To the contrary, we have recognized that "the question of a witness'[s] credibility has routinely been regarded as a decision reserved exclusively for the jury." *State v. Frisby,* 174 *N.J.* 583, 594, 811 *A.*2d 414 (2002) (internal quotation marks omitted). Nevertheless, and precisely because credibility is peculiarly within the province of jury, *id.* at 595, 811 *A.*2d 414, once the trial court commented on the strengths of the State's evidence and inferences to be drawn therefrom, the

court was obliged to point to evidence and arguments that favored defendant. In failing to do so, the court improperly focused the jury's attention on the weaknesses in defendant's case.

Apart from the failure to mention evidence adduced by defendant, the court's commentary on the relevance of technology in assessing the cause of Ms. Rosenthal's disappearance is particularly troubling. The same technology that facilitates worldwide travel could just as easily allow one to relocate on short notice and, thus, "disappear," provided one might be so inclined. Although the court would have been better advised not to engage in this commentary at all, once it did, it was required to instruct on inferences to be drawn in defendant's favor as well as those advantageous to the State.

We recognize that defense counsel failed to object to much of the challenged instruction, but we nevertheless conclude that ultimately this charge left the jury with an impermissibly unbalanced commentary on the evidence. The court had an independent duty to ensure that the jurors received an accurate instruction on the relevant law and, when necessary, a balanced assessment of the facts to allow them to apply that law. In failing to fulfill that obligation, the court erred.

C.

We have recognized that although an error or series of errors might not individually amount to plain error, in combination they can cast sufficient doubt upon the verdict to warrant reversal. *Koskovich, supra,* 168 *N.J.* at 540, 776 *A.*2d 144. Mindful of that concept here, we do not decide whether one or the other of the two errors to which we have adverted, if standing alone, would require reversal. Rather, viewing the court's error in summarizing the evidence in conjunction with the improper admission of other-crimes evidence, we conclude that a new trial must be had.

Simply stated, we cannot excuse error on the basis of other overwhelming evidence of guilt when that other evidence also possesses the taint of error. With little independent physical

evidence, the State's case hinged largely on the credibility of statements that defendant made to the police and to the reporter for the Burlington County Times. As we have explained, the introduction of the other-crimes evidence posed the distinct possibility that the jury's evaluation of defendant's confessions was affected by its inference that defendant had also killed his girlfriend. Consequently, it is impossible to isolate the error regarding the summation of the evidence on the ground that the jury had sufficient independent evidence of guilt to keep the verdict free of doubt. Thus, even if we were inclined to excuse the one-sided summation of the evidence on grounds of harmless error, the admission of other-crimes evidence precludes that possibility. In other words, we must admit that affording the jury the ability to infer that defendant had previously committed murder and then summarizing the evidence in a manner favorable to the State leaves us unable to gainsay that those errors "led the jury to a result it otherwise might not have reached." *State v. Macon*, 57 *N.J.* 325, 336, 273 *A.*2d 1 (1971). Accordingly, defendant is entitled to a new trial.

## VI.

We next address defendant's claim that the State failed to introduce sufficient corroborative evidence of defendant's confessions. At the conclusion of the State's guilt-phase case-in-chief, defendant moved for a judgment of acquittal. The trial court denied the motion, cataloging the proofs offered by the State that the court deemed corroborative. Those proofs included Faricelli's testimony about the strange noises she heard on the night of the alleged murder, the newspapers accumulated outside of Rosenthal's door, the ATM receipt indicating that Rosenthal had withdrawn the same amount of money that defendant confessed to stealing, and evidence corroborating defendant's description of the area in which he claimed to have dumped Rosenthal's body.

Before this Court, defendant raises three related issues. First, he argues that the trial court erred in denying the judgment of

acquittal, again contending that the State's proofs did not provide sufficient corroboration to render the statements trustworthy. Second, he argues that the court erred in not instructing the jury, sua sponte, on issues of corroboration. And, third, he asks this Court to adopt a new rule of law requiring an elevated quantum of evidential sufficiency to corroborate confessions in capital cases. Although we are reversing his conviction on other grounds, we address these issues because a finding that the State failed to sufficiently corroborate his confessions would, at least in this case, effectively bar retrial of defendant on these charges. *See Tibbs v. Florida,* 457 *U.S.* 31, 42, 102 *S.Ct.* 2211, 2218, 72 *L.Ed.*2d 652, 661 (1982) (noting that Fifth and Fourteenth Amendments prohibit retrial on conviction overturned on appeal for lack of sufficient evidence). After reviewing the evidence, we conclude that the State corroborated the confessions sufficiently to support the inference that the statements are trustworthy. We also hold that the trial court did not commit reversible error in failing to give a charge on corroboration. And we decline defendant's invitation to establish a higher standard of corroboration in capital cases.

### A.

"[T]o avoid the danger of convicting a defendant solely out of his own mouth of a crime that never occurred or a crime committed by someone else," *State v. Johnson,* 31 *N.J.* 489, 502–03, 158 *A.*2d 11 (1960), the State must "introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury," *State v. Lucas,* 30 *N.J.* 37, 56, 152 *A.*2d 50 (1959). A trial court should properly refuse to grant a judgment of acquittal on these grounds when the State provides "any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy." *Id.* at 62, 152 *A.*2d 50.

Because "[c]onfessions, like other admissions against interest, stand high in the probative hierarchy of proof," *id.* at 57, 152 *A.*2d

50, our "requirements are narrow with respect to the quantum of evidence required to establish corroboration in law," *State v. DiFrisco*, 118 *N.J.* 253, 273, 571 *A.*2d 914 (1990) (*DiFrisco I* ), *cert. denied*, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996). We have declined to give the rule an "unjustifiably broad meaning," *DiFrisco I, supra,* 118 *N.J.* at 271, 571 *A.*2d 914 (quoting 7 *Wigmore on Evidence* § 2072, at 524 (Chadbourn rev.1978)), and have acknowledged that "hard-and-fast rules requiring corroboration are as likely to obstruct the punishment of the guilty as they are to safeguard the innocent," *Lucas, supra,* 30 *N.J.* at 52, 152 *A.*2d 50 (quoting *McCormick on Evidence* 230 n. 5 (1954)).

As we explained in *DiFrisco I, supra,* the requirement of corroboration is both a legal and factual determination. 118 *N.J.* at 270–72, 571 *A.*2d 914. The trial court must first determine whether, as a matter of law, the State has introduced "any legal evidence," *Lucas, supra,* 30 *N.J.* at 62, 152 *A.*2d 50, that "tend[s] to generate a belief in [the statement's] trustworthiness," *id.* at 56, 152 *A.*2d 50. If the court determines that the State has satisfied that burden, any "missing details or discrepancies in the story" are "arguments and speculations [that] do not undercut *as a matter of law* the truthfulness of defendant's confession. They simply raise issues of fact as to corroboration of the confession, which are properly to be resolved by the jury." *DiFrisco I, supra,* 118 *N.J.* at 271, 571 *A.*2d 914 (internal quotation marks omitted) (alteration in original). More succinctly, "some corroboration is required as a matter of law but if there is such corroboration, the jury should resolve 'arguments and speculation' about its weight and sufficiency." *Id.* at 271–72, 571 *A.*2d 914.

Like the quantum of evidence required by the corroboration rule, the scope of the corroboration requirement similarly is circumscribed. In *Lucas, supra,* we made clear that the State must introduce, apart from a defendant's statement, "independent proof of loss or injury." 30 *N.J.* at 56, 152 *A.*2d 50. But as we further explained in *Johnson, supra,* in a trial for murder the State only needs independent proof of the victim's death; the

remaining elements of the crime may be established by the confession, so long as its corroboration requirement has been met. 31 *N.J.* at 504, 158 *A.*2d 11.

Defendant emphasizes that he could have learned many of the details contained in his statements from his employment at Somerset Towers and from media coverage of Rosenthal's disappearance. As a porter at the apartment complex, he would have learned the layout of Rosenthal's apartment, the color of the carpeting, and may have even observed the newspapers accumulating in the hallway after her disappearance. Furthermore, he argues that he could have accurately described the area where he allegedly left Rosenthal's body because he lived in the area. He also points to inconsistencies in the State's proofs. Specifically, he points to Faricelli's confusion over the date she heard the noise from Rosenthal's apartment. He also notes testimony that suggested the hole in the fence at Somerset Towers, through which he claimed to have wheeled Rosenthal's body, might have been repaired by the time that Rosenthal disappeared. Defendant further contends that his statements are untrustworthy because they are, in some instances, inconsistent with the physical evidence. Specifically, he refers to the claim in his statement that he murdered Rosenthal on a Thursday evening in the summer, when the State's other proofs indicated he killed her on a Friday night in February.

The State responds that it provided adequate corroborative evidence to support "each critical event" in defendant's statements. It points to proof that an individual of defendant's size could have dropped from the roof onto Rosenthal's balcony, Faricelli's testimony about the noises that she heard, testimony concerning the ATM receipt documenting a withdrawal of eighty dollars, and Rosenthal's missing pocketbook. Additionally, the State identifies evidence that newspapers had accumulated outside Rosenthal's door, consistent with defendant's statements. The State also argues that the police never publicized the existence of the ATM receipt and that only the person who robbed Rosenthal

would know the exact amount of money in her possession. In response to the last point, defendant claims that nothing in the record supports the State's assertion that the ATM receipt was not public knowledge.

Based on the evidence presented at trial, we conclude that the State satisfied its burden of sufficient corroboration. The trial court correctly identified much of the corroborating evidence, including Faricelli's statements and other testimony relating to the accumulated newspapers, the ATM receipt, and the missing pocketbook. We need not resolve the dispute over whether the details of the ATM receipt were disclosed to the media or released to the public prior to the date of defendant's statements. We simply note that, on remand, details of the ATM transaction may be probative of the trustworthiness of defendant's statements. *See Lucas, supra,* 30 *N.J.* at 62, 152 *A.*2d 50 (noting absence of evidence in record demonstrating, "consistent with the hypothesis of innocence, how [defendant] acquired the incriminating information which he recited to the police").

The State also provided adequate proof of Rosenthal's death. The scope of our review is limited and deferential. We ask only

whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.

[*State v. Reyes,* 50 *N.J.* 454, 459, 236 *A.*2d 385 (1967).]

*See also State v. Josephs,* 174 *N.J.* 44, 81–82, 803 *A.*2d 1074 (2002) (adopting *Reyes* standard to assess sufficiency of evidence supporting defendant's murder convictions). We give no consideration to evidence or inferences from defendant's case, *Reyes, supra,* 50 *N.J.* at 459, 236 *A.*2d 385, and do not reweigh the evidence considered by the jury, *Josephs, supra,* 174 *N.J.* at 86, 803 *A.*2d 1074. The State introduced substantial evidence of Rosenthal's lifestyle prior to her disappearance, including her close contact with family and friends, her love of her pet cat, and her conscientious and enthusiastic employment at the Elwyn

Institute. On February 22, 1991, all of that abruptly came to an end. Her friends, family, and co-workers testified that they had not heard from her since her disappearance. The jury learned of the unsuccessful efforts by the police and Rosenthal's family to locate her. That evidence provided the jury with a sufficient basis to reasonably infer that Rosenthal was dead.

### B.

Defendant also contends that the trial court failed to inform the jury sua sponte of the State's obligation to present independent evidence in support of the trustworthiness of defendant's confessions. Because he did not request a corroboration charge, we review that claim for plain error. We must determine whether the failure to give a corroboration charge, when read in the context of the jury instructions as a whole, possessed a clear capacity to bring about an unjust result. *State v. Nelson,* 173 *N.J.* 417, 447, 803 *A.2d* 1 (2002) (*Nelson II* ); *State v. Jordan,* 147 *N.J.* 409, 422, 688 *A.2d* 97 (1997).

In *DiFrisco I, supra,* the Court noted that "a defendant [is] entitled to request and receive a charge to the jury on its duty with respect to issues of corroboration." 118 *N.J.* at 274, 571 *A.2d* 914. In light of the State's proofs in this case, which relied heavily on defendant's statements and evidence corroborating those statements, the trial court most certainly would have given an instruction on corroboration had defendant requested one. However, as *DiFrisco I* makes clear, the primary onus is on the defense to request such a charge. Furthermore, we have noted on several occasions that the failure of the trial court to instruct the jury on corroboration does not rise to plain error where other aspects of the charge addressed the jury's responsibility to assess credibility, and "[t]he entire thrust of the defense" was that the statements at issue were untrue. *State v. Roach,* 146 *N.J.* 208, 229, 680 *A.2d* 634, *cert. denied,* 519 *U.S.* 1021, 117 *S.Ct.* 540, 136 *L.Ed.2d* 424 (1996); *Lucas, supra,* 30 *N.J.* at 63, 152 *A.2d* 50. As we have noted: "The argument of counsel, although not a substi-

tute for a correct charge, can mitigate the prejudicial effect of an erroneous charge." *State v. Morton,* 155 *N.J.* 383, 423, 715 *A.*2d 228 (1998) (*Morton I* ), *cert. denied,* 532 *U.S.* 931, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001).

We conclude that the failure to instruct the jury on corroboration did not amount to plain error. In both his opening and summation, defense counsel urged the jury to reject defendant's statements as untrue. In his opening, defense counsel emphasized that defendant's statements were not enough to prove that defendant committed the murder. He argued: "It's not enough. It's got to be more than just I say I did it. It's got to be proof that it took place." During his summation, he pointed to the numerous inconsistencies in the statements to suggest that defendant was "just making up things to let [the police] hear what they want to hear." He also revisited defendant's description of the earlier car accident and radio broadcast that led him to believe that he killed the other driver:

> He lived[,] in his words[,] for five to six years in terror waiting for the police to knock on his door and arrest him for killing that woman that he never killed in a fender bender in Philadelphia when he was [sixteen] years of age at a Santana concert[.] [B]ut it never happened. *It never happened. Just like this never happened* . . . . This fender bender takes place in Philadelphia, Santana concert, he imagines things, he embellishes things, what if the police had knocked on his door during that five to six years period? *He would have gave [sic] them a taped statement all about what he did at that Santana concert killing that woman and that wouldn't have been true and the statement he gave in October of 1995 wasn't true either.*
>
> [ (Emphasis added).]

Additionally, the trial court properly informed the jury of its duty to assess credibility, in general, as well as the credibility of defendant's statements. In assessing the statements' credibility, the jury must have considered the independent corroborative facts submitted by the State. *Roach, supra,* 146 *N.J.* at 229, 680 *A.*2d 634; *Lucas, supra,* 30 *N.J.* at 63, 152 *A.*2d 50. In view of defendant's theory of the case, and in consideration of the instruction as a whole, the failure of the trial court to instruct the jury specifically on its duty with respect to corroboration does not rise to the level of plain error.

## VII.

Because we already have determined defendant to be entitled to a new trial, we do not discuss the trial court's failure at sentencing to merge the felony-murder conviction into the conviction for knowing or purposeful murder, which the State concedes was error. Nor do we address several arguments defendant offers to challenge his death sentence on constitutional grounds. Defendant also attempts to raise a number of issues in his pro se brief. We reject those as either devoid of merit or duplicative of those raised by counsel. We do, however, discuss several remaining issues that are likely to recur at the new trial.

First among those issues is defendant's argument that the trial court's instructions to the jury in the guilt phase were flawed in two respects. Initially, he argues that the court's instructions on inferences that could be drawn from the fact of strangulation impermissibly diluted the State's burden of proving that defendant purposely or knowingly killed Rosenthal. Second, he alleges error in the court's refusal of his request for an instruction on attempted murder as a lesser included offense. We find no error on either point.

### A.

#### *Inferences from Strangulation*

During the charge to the jury, the trial court informed the members that they could draw certain inferences from the manner in which defendant allegedly killed Rosenthal:

A homicide or a killing by suffocation in itself would permit you to draw an inference that the defendant's purpose was to take life or cause serious bodily injury resulting in death. Suffocation is commonly understood as a form of violence designed and likely to kill a victim and hence would ordinarily not be used by one whose purpose was not to take a life or to cause serious bodily injury resulting in death. In your deliberations, you may consider the manner and circumstances of the killing and if you are satisfied beyond a reasonable doubt that the defendant suffocated and killed [Rosenthal] with his hands, you may draw an inference from the manner and circumstances of the killing as to the defendant's purpose or knowledge.

Defendant argues that this instruction violated his State and federal due process rights by relieving the State of the burden of proving all elements of the offense beyond a reasonable doubt.

Defendant failed to object to the instruction at trial, and we thus review his claims under the plain error standard. *Josephs, supra,* 174 *N.J.* at 98, 803 *A.*2d 1074. As noted, we have recognized the critical need for accuracy in jury instructions, particularly in capital cases, and have presumed erroneous instructions on material points to be reversible error. *Nelson II, supra,* 173 *N.J.* at 446–47, 803 *A.*2d 1; *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990).

As we observed in *State v. Martini,* "[i]nferences are constitutionally sound so long as the jury is not compelled to accept them and the trier of fact can rationally make the connection between the facts and the inference." 131 *N.J.* 176, 271–72, 619 *A.*2d 1208 (1993) (*Martini I*) (citing *County Court v. Allen,* 442 *U.S.* 140, 157–63, 99 *S.Ct.* 2213, 2224–27, 60 *L.Ed.*2d 777, 792–95 (1979)), *overruled in part by, State v. Fortin,* 178 *N.J.* 540, 843 *A.*2d 974 (2004) (*Fortin II*); *see also Francis v. Franklin,* 471 *U.S.* 307, 314–15, 105 *S.Ct.* 1965, 1971, 85 *L.Ed.*2d 344, 353–54 (1985) (noting that "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury"). In *Martini I, supra,* defendant claimed error in the following instruction:

A homicide or a killing with a deadly weapon such as a .32 caliber handgun in itself would permit you to draw an inference that the defendant's purpose was to take life or to cause serious bodily injury resulting in death. A deadly weapon is defined as any firearm or other weapon, device, instrument, material or substance which, in the manner it is used or intended to be used, is known to be capable of producing death or serious bodily injury.

In your deliberations you may consider the weapons used, the manner and circumstances of the killing. And if you were satisfied beyond a reasonable doubt that the defendant shot and killed the decedent with a handgun, you may draw an inference from the weapon used and from the manner and circumstances of the killing as to the defendant's purpose or knowledge.

[131 *N.J.* at 270, 619 *A.*2d 1208.]

We found no error in the instruction, concluding the charge clearly communicated to the jury that the inference was permissive and not mandatory. *Id.* at 272, 619 *A.*2d 1208. In reviewing the instruction as a whole, we noted that the trial court instructed the jury on the State's burden of proof as to every element of the offense, the reasonable doubt standard, and the presumption of innocence. *Id.* at 269–70, 619 *A.*2d 1208.

In an analogous context, we have held that "the manner of the murder, in conjunction with the defendant's statements or actions," can permit inferences regarding defendant's intent. *State v. Bey,* 129 *N.J.* 557, 578, 610 *A.*2d 814 (1992) (*Bey III*), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). In *Bey III,* after taking into account the horrific assault upon the victim, we concluded that "defendant's actions, taken as a whole, were so wantonly brutal that he could have intended only to cause death, or knew that death was practically certain to occur." *Id.* at 580, 610 *A.*2d 814.

Here, as in *Martini I, supra,* the trial court instructed the jury on the presumption of innocence, the non-shifting burden of proof on the State, the reasonable doubt standard, the elements of murder, including culpability, and inferences in general. The charge adequately informed the jury that the inference was permissive. Furthermore, the manner of the murder as described by defendant, in conjunction with defendant's other statements and actions, provided more than a sufficient basis for the jury to infer that defendant purposely or knowingly killed Rosenthal by suffocating her. No error occurred.

### B.

*Attempted–Murder Instruction*

At the charge conference, defense counsel requested that the trial court instruct the jury on attempted murder. The trial court refused, concluding that the evidence presented at trial provided no support for the notion that defendant attempted, but

failed, to murder Rosenthal. The court, however, did charge the jury on two other lesser included offenses: manslaughter and reckless manslaughter.

Defendant argues that the alleged sightings of Rosenthal provided a rational basis for the jury to infer that Rosenthal survived defendant's attack. He argues that, by failing to instruct the jury on attempted murder, the court erroneously adopted only the State's theory of the case in derogation of defendant's theory that Rosenthal remained alive after the date of the alleged murder. Furthermore, he contends that the lack of an attempted-murder instruction coerced the jury into an "all or nothing" verdict, forcing the panel to convict defendant of murder or acquit him altogether. We disagree.

A defendant is entitled to a charge on all lesser included offenses supported by the evidence "[t]o give full force to the reasonable doubt standard and to preserve defendants' rights to have the jury consider all defenses." *State v. Short,* 131 *N.J.* 47, 53, 618 *A.*2d 316 (1993). However, trial courts "shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." *N.J.S.A.* 2C:1–8e. "In order to justify a lesser included offense instruction, a rational basis must exist in the evidence for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense." *State v. Savage,* 172 *N.J.* 374, 396, 799 *A.*2d 477 (2002). Although the standard is a low one, "sheer speculation does not constitute a rational basis." *State v. Brent,* 137 *N.J.* 107, 118, 644 *A.*2d 583 (1994).

This Court has "consistently held that all forms of homicide rationally supported by the evidence, whether they be lesser-included or alternative offenses, should be placed before the jury." *State v. Purnell,* 126 *N.J.* 518, 530, 601 *A.*2d 175 (1992). Attempted murder is an included offense of homicide. *N.J.S.A.* 2c:1–8d(2). As we have noted, attempted murder requires greater culpability than murder itself:

> Although an actor may be guilty of murder if he or she intended to kill or was practically certain that his or her actions would cause or would be likely to cause death, the actor is guilty of attempted murder only if he or she actually intended the result, namely, death, to occur.
>
> [*State v. Rhett*, 127 *N.J.* 3, 7, 601 *A.2d* 689 (1992).]

Drawing all reasonable inferences from the evidence adduced at trial, we conclude that the trial court did not err in refusing to instruct the jury on attempted murder. In short, we find no rational basis to convict defendant of attempted murder and acquit him of knowing or purposeful murder. Defendant's statements constitute the only evidence admitted at trial regarding his attack on Rosenthal and support no inference that Rosenthal survived the assault and then disappeared. No evidence adduced at trial supported a theory that defendant actually attempted, but failed, to kill Rosenthal. The evidence presented at trial permitted the jury to draw one of two conclusions: defendant killed Rosenthal as he described in his statements or, alternatively, defendant's confessions were false and Rosenthal disappeared for some other reason. As the trial court recognized, if the jury accepted defendant's evidence that Rosenthal was alive after February 23, 1991, defendant would not have been found guilty of anything, given the proofs presented at this trial.

We also reject defendant's argument that the lack of an attempted-murder instruction coerced the jury into finding defendant guilty of a crime he did not commit. In *State v. Muniz*, we recognized "the injustice of an 'all-or-nothing' presentation of a criminal offense to a jury ... with respect to a defendant who may in fact be guilty of only a lesser offense that is not charged...." 118 *N.J.* 319, 327, 571 *A.2d* 948 (1990). In this case, however, the trial court instructed the jury on felony murder, aggravated manslaughter, and reckless manslaughter. The instructions properly informed the jury of all lesser offenses rationally supported by the evidence and, in doing so, avoided the coerciveness of an "all or nothing" charge.

## VIII.

Defendant also claims that a curative instruction given by the trial court after defense counsel's penalty-phase summation violated his rights under the Eighth Amendment because it prohibited the jury from considering relevant mitigating evidence. We disagree and find that the instruction properly directed the jury to disregard that portion of counsel's summation that exceeded the scope of evidence presented.

At the penalty phase, the State sought to prove the "prior murder" aggravating factor, *N.J.S.A.* 2C:11–3c(4)(a). The Legislature has restricted the scope of evidence admissible to prove the 4(a) factor to "the identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant." *N.J.S.A.* 2C:11–3c(2)(f). The State limited its proofs accordingly. James Ronca, Deputy First Assistant Prosecutor in Burlington County and the lead prosecutor in defendant's previous murder trial, testified that defendant was tried before a jury and convicted of the murder of his girlfriend, Rebecca Wertz. Dr. Robert Segal, the former medical examiner of Camden County, testified that Wertz had sustained multiple injuries to her head consistent with wounds inflicted by a hatchet. Dr. Segal testified that the multiple head injuries caused Wertz's death and that, consequently, the death was ruled a homicide.

Defendant did not cross-examine Ronca or Dr. Segal. In presenting his mitigation case, defendant introduced no evidence regarding the Wertz murder. During summation, however, defense counsel sought to characterize defendant's murder of Rosenthal as impulsive. He also commented upon the Wertz murder:

> And as horrible, as horrible as the circumstance of the Rebecca Wertz murder is, [twenty-four] blows in the head with a hatchet to his paramour, this also suggests a crime which was the result of an impulse, an overwhelming inner rage that overwhelmed all of his sense of restraint.

After defense counsel concluded his summation, the prosecutor requested a curative instruction. She argued that the commentary on the Wertz murder was beyond the bounds of mitigation

and the scope of evidence presented at trial. The trial court
agreed and instructed the jury that any

> comment from the defense ... [about the Wertz murder] as terms it being an
> impulsive crime is not appropriate because it is not the Wertz murder that is being
> focused upon other than as an aggravating factor without those types of elements
> being considered. So any reference to impulsivity as to that offense must be
> excluded by you in your deliberations.

Defense counsel did not object to the curative instruction.

We find no error in the trial court's instruction. As we noted in
*State v. Loftin*: "The scope of defendant's summation argument
must not exceed the 'four corners of the evidence.' The 'four
corners' include the evidence and all reasonable inferences drawn
therefrom." 146 *N.J.* 295, 347, 680 *A.*2d 677 (1996) (*Loftin I*)
(citations omitted). A trial court must exclude from summation
those arguments that the evidence does not reasonably support.
*Ibid.*

Here, the trial court's instruction properly prevented the jury
from considering the portion of counsel's summation that exceeded
the scope of evidence presented at trial. As discussed above, the
State limited its proof of the 4(a) aggravating factor to the identity
of the victim, her relationship with defendant, the cause of death,
and the offense of which the jury convicted defendant in that prior
proceeding. Neither the State nor defendant presented any evi-
dence concerning defendant's mental state at the time of the
Wertz murder. Consequently, any commentary on the impulsivity
of the Wertz murder was not supported by a reasonable inference
from the evidence and thus was not permissible in summation.

Furthermore, the instruction did not violate defendant's Eighth
Amendment right to have the sentencing jury consider relevant
mitigating evidence before imposing a death sentence. See *Sum-
ner v. Shuman, supra*, 483 *U.S.* at 76, 107 *S.Ct.* at 2722–23, 97
*L.Ed.*2d at 66 (noting Eighth Amendment right to have sentencing
jury consider any relevant mitigating evidence); *Eddings v. Okla-
homa, supra*, 455 *U.S.* at 113–14, 102 *S.Ct.* at 876–77, 71 *L.Ed.*2d
at 10–11 (same). We have observed that "[m]itigating evidence is
any evidence that supports a mitigating factor or undermines an

aggravating factor." *Fortin II*, supra, 178 *N.J.* at 599, 843 *A.*2d 974.

The trial court's instructions in this case, however, violated none of those basic precepts. Defendant did not contest the proofs establishing the prior-murder aggravating factor in any way nor did he submit any mitigating evidence relating to that factor. The court's instruction did not intrude on his right to do so; rather, it simply prevented counsel from advancing an argument in summation not supported by evidence at trial.

## IX.

Next, defendant alleges that three errors in the penalty-phase jury instructions invalidate his sentence. Defendant did not object to any of these instructions at trial and, therefore, we review them for plain error. *Josephs*, *supra*, 174 *N.J.* at 98, 803 *A.*2d 1074. Mindful that jury instructions are "even more crucial in a capital case because of the jury's responsibility to decide whether a defendant shall live or die," *Koskovich*, *supra*, 168 *N.J.* at 524, 776 *A.*2d 144 (internal quotation marks omitted), we nevertheless conclude that no error occurred.

### A.

### *Double Counting*

Defendant argues that the trial court's charge to the penalty-phase jury violated this Court's instructions in *State v. Bey* that courts should tell jurors not to "double count" evidence when the State relies on the same evidence to prove multiple aggravating factors. 112 *N.J.* 123, 176, 548 *A.*2d 887 (1988) (*Bey II* ), *cert. denied*, 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). He contends that the State relied on the contents of his confessions to support both the aggravating factors relating to a murder for the purpose of escaping detection, *N.J.S.A.* 2C:11–3c(4)(f), and for a murder committed during the course of a robbery and/or burglary, *N.J.S.A.* 2C:11–3c(4)(g). Defense coun-

sel did not request the double-counting instruction at trial. The State insists that no such instruction was required because different evidence supported the two aggravating factors.

In *Bey II, supra,* the defendant argued that the State improperly used the same evidence concerning his sexual assault of the murder victim to support distinct aggravating factors. 112 *N.J.* at 174, 548 *A.*2d 887. There, the State maintained that only the proof of the felony-murder aggravating factor relied on the sexual assault evidence. *Ibid.* Finding it unnecessary to resolve the dispute in light of our reversal on other grounds, we nevertheless set forth guidelines for future trials in which "the same evidence supports more than one factor." *Id.* at 175, 548 *A.*2d 887. Although we emphasized that "[t]he determination whether to impose the death penalty . . . does not follow from the mere counting of the aggravating and mitigating factors to see which is the greater," we recognized that "the side with the largest number of factors may have a practical advantage before a sentencing jury." *Ibid.* We, therefore, offered the following guidance:

> [T]he trial court [should] advise[ ] the jury that it should not simply compare the number of aggravating factors against the number of mitigating factors, that it is considering the same facts more than once, and that it should be cognizant that the same facts are being used to prove more than one aggravating factor. This result permits the jury to consider the evidence relevant to each aggravating factor, and should prevent it from giving undue weight to the number of factors when one aspect of the defendant's conduct supports multiple aggravating factors.
>
> [*Id.* at 176, 548 *A.*2d 887.]

On several occasions, we have elaborated the circumstances requiring a double-counting instruction. The *Bey II* instruction is required when "one practical fact, instead of overlapping inter-related facts, [is] doing double duty," *State v. McDougald,* 120 *N.J.* 523, 569, 577 *A.*2d 419 (1990), or when the evidence proving the aggravating factors is "identical," *Martini I, supra,* 131 *N.J.* at 289, 619 *A.*2d 1208. Generally, trial courts should give the *Bey II* instruction when the State relies on the "same conduct" to prove two aggravating factors. *Id.* at 289, 619 *A.*2d 1208. In contrast, when the factors do not rely on the same conduct or when they rest on different evidence, no such instruc-

tion is required. *Cf. McDougald, supra,* 120 *N.J.* at 569, 577 *A.*2d 419.

Turning to this appeal, we conclude that the trial court was not required to give a double-counting instruction because the State relied on different evidence to prove the 4(f) and 4(g) aggravating factors. Although defendant's multiple statements provided the proofs for both factors, the aggravating factors relied on different aspects of those statements. To prove the 4(f) "escape detection" aggravating factor, the State relied on defendant's statements that he suffocated Rosenthal because he "figured she knew who [he] was" and that killing her would guarantee that "she ... [was] not going to say anything." Corroborative evidence that defendant worked and lived in Rosenthal's building also supported the State's theory that defendant killed her to prevent her from identifying him as the intruder. The State, however, relied on different comments and evidence to prove the felony-murder aggravating factor. It pointed to defendant's explanation that he entered Rosenthal's apartment, struck her at least once in her bed when she woke up, suffocated her, and stole eighty dollars from her pocketbook.

The State, therefore, did not rely on the same evidence to prove the 4(f) and 4(g) aggravating factors. Accordingly, the trial court did not err in its instruction to the jury regarding the weighing of the aggravating factors.

### B.

#### *Acceptance of Guilt–Phase Verdict*

Defendant asserts that the trial court's explicit instruction to the penalty-phase jury that it must accept the determination that he murdered Rosenthal amounted to a directed verdict for the State on two of the aggravating factors. He claims that the instruction violated his right to have the penalty-phase jury informed of "its duty to deliberate anew concerning any facts established by the verdict in the guilt-phase determination that

the State relies on to prove an aggravating factor." *State v. Marshall,* 123 *N.J.* 1, 139, 586 *A.*2d 85 (1991) (*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). We find no error in the instructions, and conclude that the State is not required to reprove the capital murder in the penalty phase when the capital murder itself serves as an element of an alleged aggravating factor.

During the penalty-phase trial, the State sought to prove three aggravating factors. It alleged that the defendant previously had been convicted of another murder, *N.J.S.A.* 2C:11–3c(4)(a); that the crime was committed for the purpose of escaping detection, *N.J.S.A.* 2C:11–3c(4)(f); and that the crime took place during the commission of, or in flight after, committing an enumerated felony, *N.J.S.A.* 2C:11–3c(4)(g). The State submitted "robbery or burglary or both" as the "[ ]other offense" committed by defendant under the 4(f) aggravating factor. Similarly, robbery or burglary constituted the underlying offense for the 4(g) aggravating factor. The trial court properly informed the jury that "if you determine that more than one of these crimes was committed during the course of the murder, that is, both burglary and robbery, that still would constitute only one aggravating factor."

The trial court instructed on several occasions that the penalty-phase jury was bound by the guilty verdict of the guilt-phase of the trial. During voir dire, it informed each panel of prospective jurors that

> the jury about to be selected will be bound by the verdict of that first jury. The function of the jurors about to be selected in this proceeding is to determine the appropriate punishment for the defendant.... The jury about to be selected is not to question or doubt the defendant's guilt in the murder of Yeda Sharon Dede Rosenthal, nor that he committed her murder by his own conduct.

In its instruction at the beginning of the penalty phase, the court reminded the jury that it "must accept the guilty finding of the jury in the guilt phase of the trial."

The court's charge on the aggravating factors repeated this theme. Discussing the 4(g) aggravating factor, the court stated:

> The guilt phase jury has determined the defendant's guilt on the murder count. Although you have been instructed to accept its verdict, the guilt and sentencing phase[s] are considered separate proceedings. While you must accept the guilt jury's verdict of guilty of the murder of Yeda Sharon Dede Rosenthal, you must still consider all of the evidence presented in the penalty phase when considering whether or not there is proof beyond a reasonable doubt of this aggravating factor; that is, you must make a separate determination as to whether this murder was committed in connection with the robbery or burglary or both.

The court instructed the jury that "[t]he focus of this aggravating factor is the commission of a murder connected with the occurrence of certain crimes. In this particular case, the crimes are robbery and/or burglary." After defining the elements of the offense of burglary, it then proceeded to define the elements of robbery:

> A person is guilty of robbery if in the course of committing a theft he, A, knowingly inflicts bodily injury or uses force upon another, or, B, threatens another with or purposely puts her in fear of immediate bodily injury, or, C, commits or threatens immediately to commit any crime of the first or second degree. Murder is a crime of the first degree.

The court then explained that under the third prong, the State was required to prove that "the defendant committed or threatened immediately to commit the crime of murder of Ms. Rosenthal, a crime of the first degree, while in the course of committing the theft." Ultimately, the jury concluded that the State had proven each of the aggravating factors beyond a reasonable doubt and that each, by itself, outweighed beyond a reasonable doubt the mitigating factors found to exist.

Defendant argues that the trial court's instructions violated *Marshall I* and *Josephs* and amounted to a directed verdict on the aggravating factors because they precluded penalty-phase consideration of all the elements of robbery, specifically those relating to the use or threat of force, bodily injury, or a crime of the first or second degree. In other words, he maintains that by instructing the jury that it had to accept the guilt-phase verdict of murder, the court thereby directed the penalty-phase jury to consider as established those elements of robbery just described. We acknowledge that the argument has some surface appeal; however, we conclude that, after closer inspection, it fails.

In *Marshall I, supra,* we instructed trial courts to inform the penalty-phase jury of its "duty to deliberate anew concerning any facts established by the verdict in the guilt-phase determination that the State relies on to prove an aggravating factor, and of its right to reach a different conclusion concerning such facts in the penalty phase." 123 *N.J.* at 139, 586 *A.*2d 85. As we observed in *Josephs, supra,* this instruction allows the sentencing jury "to consider anew the evidence supporting his convictions and to view it from a different perspective than that of the guilt-phase jury." 174 *N.J.* at 114, 803 *A.*2d 1074. A jury properly instructed to deliberate anew upon the guilt-phase evidence may accord the aggravating factor less weight in the balancing process. *Ibid.*

Defendant asks us to extend *Marshall I* and *Josephs* to require the penalty-phase to "deliberate anew" on the capital murder itself when the State relies on that murder to prove an aggravating factor. We decline to do so. Such a holding would conflict with defendant's right to a fair sentencing hearing and would distract the penalty-phase jury from its "sole function of ... determin[ing] the appropriate sentence." *Josephs, supra,* 174 *N.J.* at 112, 803 *A.*2d 1074.

The guilt- and penalty-phase juries have fundamentally different responsibilities. The guilt-phase jury decides only whether defendant is guilty of the crimes charged and, if so, whether he is eligible for the death penalty. *Biegenwald IV, supra,* 126 *N.J.* at 44, 594 *A.*2d 172. In contrast, the penalty-phase jury "focuses on whether death is the appropriate punishment for the defendant," *State v. Koedatich,* 118 *N.J.* 513, 524, 572 *A.*2d 622 (1990) (*Koedatich II*), and "the evidence presented by the State need only be relevant to that issue and not to a defendant's guilt," *Josephs, supra,* 174 *N.J.* at 112, 803 *A.*2d 1074. Accordingly, to protect the integrity of the deliberations from prejudice by evidence not relevant to the jury's specific task, evidence admissible in one phase of a bifurcated trial may not be admissible in the other. *Fortin II, supra,* 178 *N.J.* at 569, 843 *A.*2d 974 (noting that evidence relevant only during guilt-phase

was so inflammatory as to require empanelling of separate sentencing jury); *Biegenwald IV, supra*, 126 *N.J.* at 44, 594 *A.*2d 172 (noting that prior murder convictions were relevant to determining defendant's sentence but not to his guilt).

When evidence admissible in one phase of the trial would prejudice the rights of a defendant in the other phase, a trial court may empanel different juries for the guilt- and penalty-phase trials. See *N.J.S.A.* 2C:11–3c(1) (allowing trial court to empanel separate sentencing jury upon showing of "good cause"). The prejudicial evidence may pertain to either the guilt or sentencing of a defendant. For instance, if limiting instructions would inadequately protect a defendant's sentencing hearing from prejudicial guilt-phase evidence, trial courts must empanel a separate sentencing jury. *State v. Moore*, 113 *N.J.* 239, 277, 550 *A.*2d 117 (1988). Similarly, in *Biegenwald IV, supra*, we recognized that the "blinding impact" of the prior-murder aggravating factor "most likely will require a two-jury system for all capital cases in which the State seeks to prove that factor." 126 *N.J.* at 43–44, 594 *A.*2d 172.

To require the State to reprove the capital murder during the penalty phase would undermine a primary rationale for bifurcated trials: the exclusion of unduly prejudicial guilt-phase evidence from the sentencing trial. Although we have recognized that the sentencing jury considers the guilt-phase evidence from a different perspective than the guilt-phase jury and that such deliberation can seriously affect the weighing of aggravating and mitigating factors, *Josephs, supra*, 174 *N.J.* at 114, 803 *A.*2d 1074, any additional benefit a defendant might derive from the sentencing jury's deliberation anew on the capital murder itself would be substantially outweighed by the potential for the guilt-phase evidence to prejudice those very deliberations.

In weighing the benefits to be derived from the deliberation anew instruction against the irremediable prejudice that could result from the introduction of guilt-phase evidence of the capital murder itself at the penalty-phase trial, we conclude that the risks

outweigh any potential advantages. But we emphasize the narrow scope of this holding. It is only when the capital murder serves as a component of an aggravating factor that trial courts need not instruct the jury to deliberate anew upon that murder. Of the offenses enumerated in *N.J.S.A.* 2C:11–3c(4)(g), only robbery and sexual assault require that the offense occur in conjunction with another crime. *See N.J.S.A.* 2C:14–2a(3) (defining as element of aggravated sexual assault that defendant commits assault "during the commission, or attempted commission ... of *robbery,* kidnapping, *homicide,* aggravated assault on another, burglary, arson or criminal escape" (emphasis added)); *N.J.S.A.* 2C:15–1a(3) (defining as element of robbery that defendant "[c]ommits or threatens immediately to commit any crime of the first or second degree"). We do not comment on other circumstances in which the State might seek to introduce evidence of the capital murder into the sentencing proceeding. Thus, although we reaffirm that trial courts should inform the sentencing jury of its responsibility to deliberate anew, consistent with *Marshall I* and *Josephs,* we conclude that trial courts need not instruct the jury to deliberate anew upon the capital murder itself when that murder constitutes part of the proofs of an alleged aggravating factor.

## C.

### *Instruction on Defendant's Other Sentences*

Defendant asserts that by instructing the jury that the sentence for his other crimes was not to be considered a mitigating factor, the trial court violated his rights under the Eighth Amendment to have the jury consider all relevant mitigating evidence. He acknowledges that the instructions comported with our prior holdings, but argues that when other sentences include life imprisonment without the possibility of parole, they constitute mitigating factors inasmuch as they establish a lack of future dangerousness.

The trial court informed the jury:

[I]f your verdict or your failure to reach a verdict requires that a term of imprisonment be imposed, then at a minimum the defendant will be serving two life terms, 55 years without parole, plus 30 additional years so that the defendant ... will be required to serve 85 years prior to becoming eligible for consideration for parole. With Mr. Reddish receiving credit for time served on his first case, he would, therefore, not be eligible for parole until the year 2080. Mr. Reddish was born on March 17th, 1961.

Members of the jury, the fact that Mr. Reddish is serving a lengthy sentence as a result of another case is not a mitigating factor. In other words, a capital defendant is not worthy of life because he or she may face a longer confinement in prison than another. Rather, a defendant's worthiness for life should depend only on the aggravating and mitigating factors that have been presented. I have informed you of his existing sentences and of my intention to impose a potential noncapital sentence consecutively so that you may be fully informed of the effect of your decision, that is, that as a consequence of your decision that the defendant should not receive the death penalty, he realistically will never be eligible for parole based upon a person's life expectancy.

That instruction fully informed the jury of the consequences of its decision, *Loftin I, supra,* 146 *N.J.* at 370, 680 *A.2d* 677, and all prior sentences that defendant was serving, *State v. Cooper,* 151 *N.J.* 326, 373, 700 *A.2d* 306 (1997), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.2d* 681 (2000).

 Additionally, it correctly informed the jury that prior sentences are not properly submitted as mitigating factors. *Loftin I, supra,* 146 *N.J.* at 370, 680 *A.2d* 677; *Bey III, supra,* 129 *N.J.* at 603, 610 *A.2d* 814; *Biegenwald IV, supra,* 126 *N.J.* at 49, 594 *A.2d* 172. As the Court explained in *Bey III, supra:*

The focus of the Capital Punishment Act is on individualized sentencing, requiring that the jury determine whether death is the appropriate punishment based on the circumstances of the offense and the aggravating and mitigating factors. To permit consideration of pending sentences for prior crimes might lead to the incongruous result that first-offenders would be more likely to be sentenced to death than would repeat-offenders.

[129 *N.J.* at 603, 610 *A.2d* 814.]

Furthermore, "[b]ecause the sentencing determination is fact specific and remains subject to significant sentencer discretion, the sentence imposed [on defendant] in another case under different circumstances has little probative value to the present jury's sentencing decision." *Biegenwald IV, supra,* 126 *N.J.* at 49, 594 *A.2d* 172.

In keeping with those principles, we reject defendant's argument and find no violation of his Eighth Amendment rights. As to defendant's assertion that his term of life imprisonment mitigated the risk of future dangerousness, we merely reiterate that "[a] defendant's future dangerousness is not a statutory aggravating factor and must play no part in a jury's deliberations." *Fortin II, supra,* 178 *N.J.* at 631, 843 *A.*2d 974. The State, properly, did not raise future dangerousness as an aggravating factor. *See Loftin I, supra,* 146 *N.J.* at 371, 680 *A.*2d 677 (stating "[f]uture dangerousness is not an aggravating factor in New Jersey, and our statute limits prosecutors to the enumerated aggravating factors"); *cf. State v. Rose,* 112 *N.J.* 454, 521, 548 *A.*2d 1058 (1988) (concluding that prosecutor's discussion of non-statutory aggravating factor of future dangerousness was reversible error). Consequently, the trial court's instruction was consistent with this Court's prior precedents and in no way violated defendant's Eighth Amendment right to have the jury consider all relevant mitigating evidence.

## X.

Defendant also argues that the prosecution failed to disclose exculpatory material in violation of *Brady v. Maryland,* 373 *U.S.* 83, 83 *S.Ct.* 1194, 10 *L.Ed.*2d 215 (1963). Specifically, defendant points to a "Bank by Phone Merchant Payment Check" dated March 1, 1991, a week after the alleged homicide took place. Although defendant maintains that the document constitutes evidence that Rosenthal was alive on the date of the withdrawal, the State insists it relates to an automatic transaction arranged by Rosenthal before she was murdered.

The Federal Constitution prevents the prosecution from suppressing material exculpatory evidence. *Id.* at 87, 83 *S.Ct.* at 1196–97, 10 *L.Ed.*2d at 218; *State v. Martini,* 160 *N.J.* 248, 268–69, 734 *A.*2d 257 (1999) (*Martini V*); *see also R.* 3:13–3 (governing discovery in criminal cases). If evidence favorable to the defendant has been suppressed by the State and that evidence

is likely to have affected the verdict, a conviction cannot stand. *Martini V, supra,* 160 *N.J.* at 268–69, 734 *A.*2d 257; *Marshall I, supra,* 123 *N.J.* at 199–200, 586 *A.*2d 85.

The document at issue here consists of a bank-by-phone check in the amount of $586.00, made payable to Somerset Towers (Rosenthal's landlord). Although the State informed defendant that an automated withdrawal had been made from Rosenthal's account after she was last seen, it produced the document only after the guilt-phase jury had returned its verdict on June 12, 2002. It appears uncontested that the transaction reflected payment for Rosenthal's March 1991 rent. What is disputed, however, is whether the transaction required any activity after February 22, 1991, either by Rosenthal or someone acting on her behalf.

Because we reverse defendant's conviction on other grounds, we need not evaluate defendant's contention that the State's failure to disclose the evidence constituted a *Brady* violation. Adjudicating this issue is unnecessary to guide the court presiding over defendant's retrial. Defendant will have this evidence at his next trial.

## XI.

During her opening and closing statements in the penalty-phase, the prosecutor quoted an opinion of this Court in an attempt to persuade the jury that death was the appropriate punishment in this case. Although defendant raised no objection at the time, he argues on appeal that the State misstated the law and thereby engaged in misconduct that necessitates a new trial. Recognizing that we need not determine whether those remarks rose to the level of reversible misconduct, we nonetheless offer the following observations for future guidance.

It is but a truism that prosecutors, as lawyers, are engaged in an oratorical profession. As such, and in consonance with our adversarial method of ascertaining the truth, we properly afford counsel on both sides latitude for forceful and graphic advocacy. *State v. Smith,* 167 *N.J.* 158, 177, 770 *A.*2d 255 (2001);

*State v. Harris*, 141 *N.J.* 525, 559, 662 *A.*2d 333 (1995). Our countenance of a certain measure of verbal flair is, however, tempered by the command that prosecutors are charged not simply with the task of securing victory for the State but, more fundamentally, with seeing that justice is served. *Smith, supra,* 167 *N.J.* at 177, 770 *A.*2d 255. "Absolute adherence to this duty is stringently compelled in capital cases where the penalty is death." *State v. Williams*, 113 *N.J.* 393, 448, 550 *A.*2d 1172 (1988) (*Williams II* ). Accordingly, "prosecutors should not make inaccurate legal or factual assertions during a trial and ... must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." *Smith, supra,* 167 *N.J.* at 178, 770 *A.*2d 255.

In her opening statement, the prosecutor remarked:

We are not here to rehabilitate Charles Reddish. Charles Reddish, Junior, is here to be punished for the crime of murder. Punished for the murder of Dede Rosenthal.

As you listen to some of the testimony, it may be easy to feel sympathy for him. It may be easy to put yourself in his shoes as sits in this courtroom[,] facing our law's harshest punishment. . . .

As you listen to the testimony, keep in mind the words of our New Jersey State Supreme Court when it wrote, quote, *Our society's ultimate sanction, the death penalty, is properly imposed on those who act with the most culpable state of mind, namely, the purpose or the knowledge that their victims will die.* Well, that was exactly what this defendant wanted when he murdered Dede Rosenthal. [ (Emphasis added).]

During closing, she then reiterated:

A week ago I stood right here before you and asked you to keep in mind the words of our New Jersey State Supreme Court. Their words that *our society's ultimate sanction, the death penalty, is properly imposed on those who act with the most culpable state of mind, namely, the purpose or knowledge that their victims will die.* And that's true, that's very true. And here in this courtroom is exactly that kind of murder. Precisely the kind of killer defined by that statement. Charles Reddish, Junior.

[ (Emphasis added).]

The prosecutor was referring to this Court's opinion in *State v. Gerald*, 113 *N.J.* 40, 89, 549 *A.*2d 792 (1988). The quote is drawn from our discussion of the different mental states attaching to various forms of homicide, including felony murder, serious-bodily-

injury (SBI) murder, and knowing or purposeful murder. *Id.* at 88–89, 549 *A.*2d 792. In that discussion, we explained that knowing or purposeful murder involved the greatest culpability. *Ibid.* Accordingly, we determined that category of defendants to be uniquely qualified for the death penalty. *Ibid.* Conversely, we held that the New Jersey Constitution prohibited the imposition of death on those "with a less culpable state of mind." *Id.* at 89, 549 *A.*2d 792. By no means, however, did we indicate that guilt of knowing or purposeful murder constituted both a necessary *and sufficient* condition for the imposition of death. Then, as now, the propriety of death as a punishment hinged on a weighing of statutory aggravating and mitigating factors. *Id.* at 64, 549 *A.*2d 792.

In short, the prosecutor misstated the law by taking the single quoted sentence out of context and implying that knowing or purposeful murder will alone justify sentencing a defendant to death. Having clarified the issue, we trust that the same mistake will not be repeated at any subsequent proceeding.

## XII.

▆▆▆ Defendant also claims the trial court erred in allowing the prosecutor to overstep her bounds during voir dire. At the selection of the penalty-phase jury, the prosecutor repeatedly made statements that the "law" prevented her from divulging the details of the murder underlying the prior-murder aggravating factor. In a representative exchange, she asked one potential juror "[w]hat if anything would you want to know about the facts and circumstances of the other murder?" The juror, understandably, responded that she would "want to know everything and [she would] also want to know everything about the defendant." The prosecutor responded,

I hate to disappoint you but the law says that the only thing that I'm allowed to tell you or the only evidence that I'm allowed to present to you about this first aggravating factor, the other murder, under the law all I'm allowed to tell you about is the victim's name, the fact that [the defendant] was convicted, the manner in which the victim was killed, and the relationship between the victim and the

defendant. That's all I'm allowed to tell you by law. If I told you more I'd be violating the law.

The prosecutor asked similar questions, and gave similar responses, to numerous other potential jurors. At one point, defense counsel objected to an exchange and requested that the trial court, not the prosecutor, discuss the limitations on evidence admissible to prove the prior-murder aggravating factor. He argued:

[The prosecutor] does not all the time, but she does sometimes say I can't tell you the why. Now, I would respectfully contend that although it's appropriate for either the State or the Court to inquire of the juror as to whether the limitations in the evidence which can be presented would preclude them from giving careful consideration to [the prior-murder aggravating factor], to specifically say I can't tell you the why, I can't tell you perhaps some other factor, suggests to the juror that there is something about that factor that they really need to know. It suggests to the juror that they're being unfairly deprived of information since they almost all say they'd like to know everything about the other case. It suggests that the defense is concealing something. . . .

The trial court overruled defendant's objection and denied counsel's motion to bar further prosecutorial inquiry into the subject.

Defendant now contends that those numerous statements amounted to impermissible allusions to personal knowledge of prejudicial evidence outside of the record. The State responds that most of the prosecutor's comments were appropriate. It concedes that an exchange with one potential juror might have improperly suggested that the prosecutor would like to present additional details, but argues that the trial court's curative instruction and the fact that the particular juror did not serve on the jury rendered the comment harmless.

In view of our decision to reverse on other grounds, we address this point only briefly. The prosecutor accurately described the limitations imposed by *N.J.S.A.* 2C:11–3c(2)(f) on evidence admissible to prove the prior murder aggravating factor.[3] As we noted in *Josephs, supra*, the provision's purpose is "to avoid turning the

---

[3] As noted above, *N.J.S.A.* 2C:11–3c(2)(f) provides that "[e]vidence offered by the State with regard to the establishment of a prior homicide conviction ... may include the identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant."

sentencing proceeding into a second trial of the previous case and at the same time to provide the jury with some information about the prior conviction." 174 *N.J.* at 117–18, 803 *A.*2d 1074 (quoting *State v. Erazo,* 126 *N.J.* 112, 136, 594 *A.*2d 232 (1991)). Moreover, the potential jurors' ability to follow instructions when considering evidence relating to aggravating factors constituted an appropriate subject for voir dire. See *State v. Papasavvas,* 163 *N.J.* 565, 584, 751 *A.*2d 40 (2000) (observing that purpose of voir dire is to allow parties "to discern the source of attitudes that would substantially interfere with the jurors' ability to follow the law"). Indeed, defense counsel, as well as the trial court, also questioned prospective jurors about the limited evidence that the State would present in support of the prior-murder aggravating factor.

We disagree with defendant's characterization of the prosecutor's statements. Excepting certain comments that the State concedes were inappropriate, we believe that the prosecutor's remarks about the constraints on the State's proofs were not inappropriate references to evidence outside of the record nor were they invitations to the jurors to imagine the details of the other murder. Those statements that did stray into improper commentary did not prejudice defendant's right to a fair trial because the court promptly gave a curative instruction.

That said, the better course of action in cases involving *N.J.S.A.* 2C:11–3c(4)(a) as an aggravating factor would be for the trial court—rather than counsel—to discuss the limitations on evidence admissible to prove that aggravating factor. Incorporating the limitations on the proofs into the court's introductory comments will inform the jury of those limits at the outset and will provide a useful referent for later questioning by the attorneys. As we instructed in *Williams II, supra:*

> Knowledge about what constitutes capital murder, the bifurcated proceeding that separates the guilt and penalty phases, and the use of the "aggravating and mitigating factors" scheme during sentencing will enable all potential jurors to answer questions concerning the death penalty free of misconceptions and faulty assumptions concerning how the law is administered in this state. Additionally, this type of instruction will provide all jurors with a common base of information

from which to answer questions, removing any difference between jurors based on knowledge of the law.

[113 *N.J.* at 412 n. 5, 550 *A.*2d 1172.]

When the circumstances require, instruction on the limitations imposed by *N.J.S.A.* 2C:11–3c(2)(f) will advance these same goals, enable a more thorough and fruitful voir dire, and reduce the risk of improper allusions to evidence outside the record.

## XIII.

The State moved *in limine* to bar the defense from using the words "kill," "murder," or similar terminology when referring to the death penalty. The trial court granted that motion, prompting defendant to complain on appeal that the court impermissibly minimized the jury's sense of responsibility for determining the appropriateness of death as a punishment. We conclude that, by preventing defendant from employing the word "kill," the court did not improperly constrain defendant in arguing his case to the jury.

Although the parties are afforded considerable leeway in making closing arguments to juries, *State v. Frost,* 158 *N.J.* 76, 82–83, 727 *A.*2d 1 (1999), courts properly exercise discretion in precluding arguments that will inflame the passion of jurors so as to distract them from their central mission of rationally evaluating the evidence, *Williams II, supra,* 113 *N.J.* at 448–52, 550 *A.*2d 1172.

With those principles in mind, we find that the court properly precluded the use of the word "murder" to describe the imposition of the death penalty. That word carries with it the opprobrium of an illegal act. As such, it is an utterly inapt characterization of the state-sanctioned punishment of death. Similarly, the court appropriately prevented the use of the word "kill" in reference to the jurors' role in a death-penalty proceeding. It is not the jurors who "kill" a defendant when a verdict of death is returned. Their role is limited to a determination of the proper sentence. Accordingly, the use of the inflammatory term "kill" would only distract

the members from the dispassionate discharge of their duty to evaluate and weigh the statutory aggravating and mitigating factors. We thus find no error.

## XIV.

Finally, defendant challenges his sentence on the ground that the aggravating factors on which his death sentence was based were not submitted to and returned by the grand jury. Because we are reversing defendant's conviction on other grounds, he must be retried. Therefore, in accordance with *Fortin II, supra,* 178 *N.J.* at 650, 843 *A.*2d 974, the State shall be required to submit the aggravating factors to the grand jury in order to obtain a supplemental indictment setting forth those factors that warrant the death penalty.

## XV.

For the reasons set forth above, defendant's conviction is reversed, and the matter is remanded for a new trial.

*For reversal and remandment*—Chief Justice PORITZ and Justice LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.